**Dennis C. DEYO, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 22058.**

United States Court of Appeals
Ninth Circuit.

June 5, 1968.

Kent Ten Brink (argued), Los Angeles, Cal., for appellant.

Arthur A. Dickerman (argued), Dept. of Health, Education & Welfare, William M. Byrne, Jr., U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division, William J. Gargaro, Jr., Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and MERRILL, Circuit Judges, and BELLONI, District Judge.

MERRILL, Circuit Judge:

Appellant was convicted of the possession and sale of LSD–25 in violation of the 1965 amendments to the Federal Food, Drug, and Cosmetic Act.[1]

---

1. 21 U.S.C. § 331(q) (2) prohibits:
"* * * (2) the sale, delivery, or other disposition of a drug in violation of section 360a(b) of this title; (3) the possession of a drug in violation of section 360a(c) of this title; * * *"
    21 U.S.C. § 360a(b) provides:
"No person * * * shall sell, deliver, or otherwise dispose of any depressant or stimulant drug to any other person."
    21 U.S.C. § 360a(c) provides:

"No person * * * shall possess any depressant or stimulant drug otherwise than (1) for the personal use of himself or a member of his household, or (2) for administration to an animal owned by him or a member of his household. In any criminal prosecution for possession of a depressant or stimulant drug in violation of this subsection (which is made a prohibited act by section 331(q) (3) of this title), the United States shall have

There is no dispute of the fact that he acted in violation of these statutes. The sole question here raised is their constitutionality.[2]

The amendments are challenged as exceeding the constitutional grant of power to Congress in that the regulation in question is not brought within the ambit of any enumerated constitutional power such as taxation, the declaration of war or the control of interstate and foreign commerce. Specifically, it is claimed that the 1965 Act is unconstitutional in that, as contrasted with acts dealing with other drugs, it makes criminal the sale or possession for sale of LSD without regard to whether the drug has crossed state lines or international boundaries.

The amendments involved relate to "depressant and stimulant drugs." There is no question but that Congress here has resorted to a wholly new technique for bringing the regulation of drug traffic within the scope of the commerce clause. Through more conventional legislation Congress has sought to control interstate traffic in "dangerous drugs" that are suitable for bona fide prescription sales, 21 U.S.C. §§ 331, 353(b) (1),

and unproven "new drugs" (which include some of the dangerous drugs not yet suitable for prescription sales), 21 U.S.C. §§ 355, 321(p). See United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948); United States v. 2600 State Drugs, Inc., 235 F.2d 913 (7th Cir.), cert. denied, 352 U.S. 848, 77 S.Ct. 68, 1 L.Ed.2d 59 (1956). Where proof of origin is especially difficult through lack of indicia, as in the case of heroin and marijuana, which move through international and interstate channels in clandestine manner, the facts of importation and knowledge are established by presumption founded on rational inference from unexplained possession. 21 U.S.C. §§ 174, 176a.

The statute here in its elimination of the necessity for establishing interstate transportation, even by presumption, is characterized by appellant as "a blatant attempt to appropriate for the federal government general police powers," which the Constitution specifically reserves to the states.

The ostensible basis for this regulation under the commerce clause appears in the "Congressional Findings and Decision of Policy" contained in the Act.

the burden of proof that the possession involved does not come within the exceptions contained in clauses (1) and (2) of the preceding sentence."

"Depressant or stimulant drug" is defined in § 321(v) as follows:

"(1) any drug which contains any quantity of (A) barbituric acid or any of the salts of barbituric acid; or (B) any derivative of barbituric acid which has been designated by the Secretary under section 352(d) of this title as habit forming;

(2) any drug which contains any quantity of (A) amphetamine or any of its optical isomers; (B) any salt of amphetamine or any salt of an optical isomer of amphetamine, or (C) any substance which the Secretary, after investigation, has found to be, and by regulation designated as, habit forming because of its stimulant effect on the central nervous system; or

(3) any drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having, a

potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect; except that the Secretary shall not designate under this paragraph, or under clause (C) of subparagraph (2), any substance that is now included, or is hereafter included, within the classifications stated in section 4731, and marihuana as defined in section 4761 of Title 26."

By regulation, 21 C.F.R. § 166.3, the Federal Food and Drug Commissioner has designated all drugs containing any amount of LSD–25 as having a potential for abuse because of their hallucinogenic effect.

The constitutionality of this delegation of authority to the Secretary (an issue not here presented) was upheld in White v. United States, infra, note 2.

2. In White v. United States, 395 F.2d 5 (1st Cir. May 17, 1968), this question has just been considered and the constitutionality of the Act as applied to LSD was upheld. We arrive at the same result.

21 U.S.C.A. § 360a Note.[3] There Congress found a clear danger of national proportions in unregulated traffic of depressant and stimulant drugs necessitating its action respecting interstate traffic in such drugs;[4] that since interstate traffic cannot be distinguished from intrastate traffic due to lack of indicia of drug origin, the former cannot effectively be regulated without as well regulating the latter; and that regulation of interstate commerce, without regulation of intrastate commerce, would adversely affect the former.

It may be questioned whether the problem of identifying the origin of a drug would alone justify regulation as broad as that here imposed which encompasses drugs admittedly local in origin and identifiable as such. (It would be no defense to the crime here charged to prove that the LSD was local in origin.)[5]

This question, however, we need not reach. Regulation of intrastate commerce in "stimulant and depressant" drugs is constitutionally justifiable because, under the congressional findings, not only is there a problem of identifying their origin, but such commerce also adversely affects interstate commerce in these drugs. Where intrastate transactions are so commingled with and have such an economic effect upon interstate transactions that regulation of both types of commerce is required if there is to be effective regulation of either, the Supreme Court has in the past upheld the regulation of purely local traffic. In the Minnesota Rate Cases, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913), and the Shreveport Case (Houston, East & West Texas Railway Co. v. United States), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), it was held that intrastate railroad rates could be

3. "The Congress hereby finds and declares that there is a widespread illicit traffic in depressant and stimulant drugs moving in or otherwise affecting interstate commerce; that the use of such drugs, when not under the supervision of a licensed practitioner, often endangers safety on the highways (without distinction of interstate and intrastate traffic thereon) and otherwise has become a threat to the public health and safety, making additional regulation of such drugs necessary regardless of the intrastate or interstate origin of such drugs; that in order to make regulation and protection of interstate commerce in such drugs effective, regulation of intrastate commerce is also necessary because, among other things, such drugs, when held for illicit sale, often do not bear labeling showing their place of origin and because in the form in which they are so held or in which they are consumed a determination of their place of origin is often extremely difficult or impossible; and that regulation of interstate commerce without the regulation of intrastate commerce in such drugs, as provided in this Act, would discriminate against and adversely affect interstate commerce in such drugs."

4. Congressional hearings established that by 1965 there was a clear national danger from the abuse of barbiturate and amphetamine tablets. According to congressional findings published in 1965 U.S. Code Cong. & Ad.News, pp. 1895–1909,

of the 9 billion of such tablets produced annually, over half or 4½ billion are eventually distributed through illicit channels. These "pep pills" or "goof balls" have been used by all strata of society for many purposes: by the "hard" drug (e. g. heroin) addict to supplement his craving, by teenagers looking for thrills, by suburban housewives seeking relief from anxieties, by truck drivers to give a false feeling of exhilaration to mask exhaustion, and as an easy suicide. Illegal traffic in such drugs had proved highly profitable and had led to the formation of organized sales rings and racketeer interest. See Hearings on Drug Abuse Control Amendments of 1965, House Committee on Interstate & Foreign Commerce, 89th Cong., 1st Sess. (1965) at 22, #30 (hereinafter Hearings). In President Kennedy's Consumer Protection Message of March 15, 1962, he recommended legislation controlling barbiturates and amphetamines and the need for such action was the subject of a subsequent White House Conference. Hearings at 104.

5. It may be noted that many other drugs, including marijuana and heroin, are difficult to trace to a specific point of origin through external indicia. Further, proof of interstate transportation of automobiles and prostitutes may be difficult at times, yet the legitimacy of federal regulation of all automobile thefts or prostitution does not necessarily follow.

federally controlled because of their competitive relation to interstate rates. If left unregulated, lower intrastate rates could severely injure interstate railroad commerce. In the Minnesota Rate Cases the Court said, 230 U.S. at 399, 33 S.Ct. at 739:

"The authority of Congress extends to every part of interstate commerce * * * and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the Nation may deal with the internal concerns of the State, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

This rationale was later adopted to sustain federal regulation of the price of milk produced and sold intrastate in United States v. Wrightwood Dairy, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942), where the Court said:

"The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the at-

tainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce."

The Court found that, as in the case of railroad traffic, intrastate and interstate milk were in direct competition and in fact were often physically commingled. The resulting interference with the effectiveness of federal regulation of interstate milk, together with the discriminatory effect upon interstate milk which nonregulation of intrastate milk would have, justified regulation of all milk prices.

Federal regulation of wages and hours of labor, United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), intrastate tobacco, Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092 (1939), and completely home-produced and consumed wheat, Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), has been sustained by the Supreme Court on a similar constitutional basis. Other Federal Food, Drug and Cosmetic Act legislation than that presently before us has explicitly relied upon this history of commerce clause interpretation to support its regulation of intrastate transactions. See Oleomargine Act of 1950, 21 U.S.C. §§ 347(a), 347a. It seems late in the day for appellant now to argue that the regulation of intrastate activities by Congress is in all cases an unconstitutional usurpation of the police power of the states.[6]

This past line of decisions is clearly applicable to amphetamines and barbiturates, both of which have established legitimate medical uses and as to which extensive legitimate interstate commerce exists.[7] The rigid record keeping fed-

6. For a complete history of the development of this doctrine, see Stern, The Commerce Clause and the National Economy, 1933–1946, 59 Harv.L.Rev. 645, 883 (1946). See also 1 Schwartz, Commentary on the Constitution of the United States, 178–237 (1963); Light, The Federal Commerce Power, 49 Va.L. Rev. 717, 728 (1963); Stern, The Scope of the Phrase Interstate Commerce, 41 A.B.A.J. 823 (1955).

7. This is recognized in Senate Report No. 337, 1965 U.S.Code Cong. & Ad.News 1895, 1898. Further, a representative of the American Medical Association testified as follows at Hearings 146:
"Both depressant and stimulant medications are widely used by the practicing physician. Some of the medical uses of the barbiturates and other depressant drugs are to relieve insomnia, to relieve apprehension, tension and nervousness.

erally required of manufacturers, processors and dispensers of such drugs by 21 U.S.C. § 360a(d) for the purpose of eliminating their diversion to illicit uses imposes an onerous duty which many would avoid if they could through confining themselves to wholly intrastate manufacture, shipment and sale. The incentive to avoid the consequences of federal regulation by not purchasing drugs manufactured or processed out of state would thus, absent regulation of intrastate commerce, discriminate against and adversely affect legitimate interstate commerce.

That the same is true of experimental new drugs such as LSD is not so clear. Prescription sale does not yet constitute a source of legitimate interstate commerce with which unregulated intrastate commerce may compete and which it might adversely affect.

With respect to such new drugs (whose safety, effectiveness and potential for public good have not yet been established) it is, however, the policy of Congress to encourage their nationwide distribution for legitimate investigational use under appropriate safeguards so that they may be made available to the public as soon as their usefulness and safety are proven. 21 U.S.C. §§ 321(p) (1), 355(i); 21 C.F.R. § 102.3; cf. Turkel v. Food & Drug Administration, 334 F.2d 844 (6th Cir. 1964), cert. denied, 379 U.S. 990, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965). At present research is continuing on the efficacy of LSD as an aid in alchoholic and prisoner rehabilitation, to relieve pain and bring solace to the dying, to treat neuroses, and for other forms of psychotherapy. Clark, Religious Aspects of Psychedelic Drugs, 56 Calif.L.Rev. 86, 92–94 (1968); Comment, LSD and Freedom of Religion, 1 U.S.F.L.Rev. 131, 133–34 (1966); Hearings on Drug Safety Before a Subcom-

mittee of the House Committee on Government Operations, 89th Cong., 2d Sess., at 2208–71 (June 9, 1966). Interstate commerce does, then, exist in the protection of which Congress can properly act.

There can be little doubt that unregulated and widespread local manufacture, sale and use of such drugs drastically interferes with the federal purpose and with the orderly investigation, development and marketing of potentially useful and beneficial medical aids. This alone may not suffice, however. The federal program may well justify regulation of *interstate* commerce in new or experimental drugs, thus providing the legitimate purpose that must be behind all congressional use of the commerce power. It does not necessarily follow, however, that the national need for regulation, standing alone, provides a constitutional basis for *local* regulation by the federal government, whether or not local government has seen fit to attempt it.

Local regulation here, however, is not based solely on the national need for orderly investigation of new drugs. Here it does appear that unregulated local traffic in LSD does have an adverse effect on interstate commerce, limited though that effect may be. Congressional hearings indicate a disinclination on the part of the bona fide researcher to become involved with drugs where widespread unregulated use has given them a sordid reputation. Hearings on Drug Safety Before a Subcommittee of the House Committee on Government Operations, supra, pp. 2164–65, 2207–08 (June 7, 1966). Similarly, there is a reluctance on the part of manufacturers to invest in the production for research of stigmatized drugs. Testimony of FDA Commissioner Goddard, id., at

---

or to produce partial or complete unconsciousness as an anesthesia. They are also used as aids to complete relaxation in psychiatric examination and therapy. Another valuable use is in the control of convulsive disorders. The stimu-

lant drugs might be used in supportive treatment of certain depressive states, in the treatment of certain behavior disorders of childhood, or as temporary curbs of appetite in weight-control programs."

2133, 2136.[8] This is not unlike the situation involved in United States v. Ferger, 250 U.S. 199, 39 S.Ct. 445, 63 L.Ed. 936 (1919), where it was held that Congress could constitutionally prohibit and punish the making of spurious bills of lading, despite their intrastate origin and use, as a means of preventing the weakening of public confidence in genuine bills and the consequent dampening effect on the interstate commerce that moved in reliance upon such bills.[9]

In our judgment a drying up of the legitimate sources of an experimental drug and the discouragement of research attributable to intrastate activities may be said to constitute a sufficiently adverse effect upon the legitimate interstate commerce involved in research to justify federal regulation of intrastate transactions in that drug.

■■ As was said by the Supreme Court in Stafford v. Wallace, 258 U.S. 495 at 521, 42 S.Ct. 397, at 403, 66 L.Ed. 735 (1922):

"Whatever * * * threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it. This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly non-existent."

Judgment affirmed.

8. The Swiss firm that developed LSD and sponsored its investigational use in this country since 1953 discontinued its sponsorship in 1966, and the only present legitimate supplier of LSD for research in the United States is a Government agency, the National Institute of Mental Health. The Swiss firm's discontinuance of research was caused by the vastly unfavorable publicity the drug had received because of unauthorized, thrill-seeking use and the frightening effects the drug had when taken in these uncontrolled settings. Kline, The Alteration of "Natural" Biological States by LSD, 19 Hastings L.J. 803, 806 (1968).

9. We may note as well that an incentive to investment in the manufacture and research in new drugs undoubtedly is the possibility of future profit in their licensed manufacture and sale through interstate commerce should their safety and beneficial usefulness be established to the satisfaction of the Federal Food and Drug Administration. The existence of a flourishing and spreading local traffic with which interstate commerce would eventually have to compete if the drugs were finally approved might well have a dampening effect upon present willingness to undertake such investment and the interstate commerce it involves.