**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert CERRITO, Defendant-Appellant.
No. 17148.**

United States Court of Appeals
Seventh Circuit.

July 25, 1969.

As Corrected on Denial of Rehearing
Sept. 10, 1969.

Julius Lucius Echeles, Chicago, Ill., for appellant.

Thomas A. Foran, U. S. Atty., Chicago, Ill., John Peter Lulinski, Michael B. Nash, Michael P. Stavelis, Asst. U. S. Attys., of counsel, for appellee.

Before MAJOR, Senior Circuit Judge, and KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

Defendant Cerrito appeals from his conviction by the district court, without a jury of conspiring unlawfully[1] to sell amphetamine tablets, with intent to defraud by dispensing counterfeit drugs.[2] We affirm.

In substance, Cerrito is charged with conspiracy with Baldino, Scala, Fisher and Gertz, in violation of 18 U.S.C. § 371, to possess, sell and deliver amphetamine tablets, offenses under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331(q) (2), and (3), with intent to defraud and mislead by dispensing counterfeit tablets held for sale, an offense under 21 U.S.C. § 331(i) (3).

Cerrito contends mainly that there is no evidence sufficient to connect him with the alleged conspiracy; and that Subchapter III, "Prohibited Acts and Penalties of the Food and Drug Act," is unconstitutional under the Tenth Amendment as applied to him because there is no evidence that the acts were done in interstate commerce. We see no merit in either contention.

We turn first to the constitutional contention. Generally speaking the power of Congress to regulate commerce extends to intrastate activities which affect interstate commerce. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Specifically, Congress in adopting the parts of the Food and Drug Act before us found that "illicit traffic in depressant and stimulant drugs" affects interstate commerce because of danger to public health and safety on interstate as well as intrastate highways, and because of the necessity for effective regulation of drug traffic due to difficulties in determining place of origin. 21 U.S.C. § 360a.[3]

The Congressional findings furnish a basis for determining that the challenged statutes are constitutional. Whalen v. United States, 398 F.2d 286 (8th Cir.1968); Deyo v. United States, 396 F.2d 595 (9th Cir.1968); White v. United States, 395 F.2d 5 (1st Cir. 1968); United States v. Freeman, 275 F.Supp. 803 (N.D.Ill.1967). We hold that the statutes are not unconstitutional as applied to Cerrito.

It is Cerrito's contention that the evidence taken favorably to the government shows the conspiracy charged against him and others was completed by January 11, 1967, before he "came into the picture" on January 18, and therefore cannot sustain his conviction.

Count 1 of the indictment charges a conspiracy beginning December 13, 1966, and continuing until the indictment was filed March 30, 1967; and that part of the conspiracy was sales of drugs to LaBree, a government agent, with intent to defraud, on December 15, 1966, January 11 and 18, and February 28, 1967.

LaBree testified to the following events: On December 13, 1966, he discussed with Baldino and Scala the pur-

---

1. 21 U.S.C. § 331(q) (2).

2. 21 U.S.C. § 331(i) (3).

3. See note 21 U.S.C.A. § 360a.

chase of one million amphetamine tablets for $23,000. On January 11, 1967, he met Baldino and Fisher and purchased 50,000 which Fisher had "on hand" for $1,100. Later, on January 11 and 12 he reported to Baldino the pills were counterfeit. On January 13 he met with agents Doyle and Gallagher, posing as "juice racketeers from Indiana," and Scala, Baldino and Gertz. Prior to this meeting he explained to Baldino that he had borrowed the $1,100 purchase money from the pseudo Indiana racketeers. Baldino—pretending to be a "Spangola" —and Scala promised the agents to return the money, and on the 15th Baldino called LaBree and set up a meeting for the next day. Cerrito was present at the meeting the next day where he was introduced by Baldino as "My man John." Cerrito used the analogy of a sale of shirts with borrowed money to explain LaBree's claimed predicament vis-a-vis the pseudo "juice racketeer." One of the "racketeers" entered and told Baldino he was responsible for the money. "Look," Cerrito replied, "he is no more responsible than I am for that." The next day Fisher gave LaBree the $1,100. On January 18 Baldino called LaBree for the pills and LaBree replied the "racketeer" had taken them. Baldino then said Cerrito was going to kill LaBree. On the 19th Cerrito threatened LaBree's life. Agent Doyle testified that he asked Cerrito what his stake in the transaction was and Cerrito replied that he had as much to say as Baldino and Fisher. Cerrito denied the statements the agents attributed to him and denied treatening LaBree.

 We think all of this testimony furnishes a sufficient basis for the finding beyond a reasonable doubt that the conspiracy had not terminated when Cerrito entered "the picture," but that he participated in it to sell drugs with intent to defraud as charged in the

indictment. It is not necessary that the evidence show Cerrito to have been in the conspiracy at its inception in order that he be found a participant. United States v. Hickey, 360 F.2d 127, 138 (7th Cir.1966). Once connected with the conspiracy he is chargeable with whatever was said or done previously by his co-conspirators. United States v. Iacullo, 226 F.2d 788, 794 (7th Cir.1955). What transpired on January 16 was a development of the January 11 transaction and was closely related to it.

We hold that the evidence supports the finding beyond a reasonable doubt that Cerrito entered the conspiracy before it was terminated.

 It was stipulated that the counterfeit tablets contained caffein and were all manufactured on a single punch machine, and that both the genuine pills and the counterfeit pills delivered to LaBree were "white, round, double-scored tablets" and that the genuine tablets were manufactured by a Tennessee drug manufacturer.[4] We therefore view as frivolous Cerrito's claim that there was no evidence that the counterfeit tablets bore the unauthorized likeness or trade name of a drug manufacturer required by 21 U.S.C. § 321 (g) (2). The same is true of the claim that defendants did not represent the tablets as genuine. The representation did not have to be made directly and orally.

 Finally, there is no merit in Cerrito's claim that the government did not sustain its burden to prove that he did not come within the exceptions of 21 U. S.C. § 360a(a), (b), or (c). Section 360a(c) does provide that "In any criminal prosecution for possession of a depressant or stimulant drug in violation of this subsection * * * the United States shall have the burden of proof that the possession involved does not come within the exceptions * * *."[5]

4. This court during oral argument saw and compared the genuine and counterfeit tablets.

5. The exceptions as pertinent are "No person * * * shall possess any depres-

sant or stimulant drug otherwise than (1) for * * * personal use * * * or (2) for administration to an animal * * *."

We think the evidence as to quantity of tablets possessed and sold is sufficient to justify the inference that the tablets were neither for personal use of, or for administering to a dog owned by, Cerrito.

Affirmed.