UNITED STATES of America,
Appellee,

v.

Alcides PEREZ, Appellant.

No. 248, Docket 33767.

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1969.

Decided May 1, 1970.

---

Leonard H. Sandler, New York City (Albert J. Krieger, New York City, on the brief), for appellant.

Roger A. Pauley, Atty., U. S. Dept. of Justice, Washington, D. C. (Edward R. Neaher, U. S. Atty. for the Eastern District of New York, Jerome M. Feit, Atty., U. S. Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before WATERMAN, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge.

Alcides Perez appeals from a judgment of the United States District Court for the Eastern District of New York, George Rosling, J., entered on a jury verdict convicting him of five counts of using extortionate means to collect or attempt to collect extensions of credit. 18 U.S.C. §§ 891, 894. Although appellant claims various errors in his trial, his major argument on appeal is that Congress did not have the power to pass the statute under which appellant was convicted, either under the Commerce

Clause or the Bankruptcy Clause of the Constitution. We hold that the trial was proper and the evidence sufficient, and that Congress has the power to prohibit extortionate credit transactions.

The facts underlying appellant's conviction may be stated briefly. The victim of appellant's brutal collection methods was Alexis Miranda, a 26-year-old married butcher with three children, who was attempting to open his own butcher shop. Unable to obtain operating capital by a loan through such legitimate channels as the Chase Manhattan Bank and the Small Business Administration, Miranda made the mistake of borrowing some $3,000 from Perez. From the record, the rate of interest was somewhat vague but it was obviously large enough to perpetuate the indebtedness forever. Miranda initially had to make repayments at a rate of $105 per week; Perez subsequently raised that to $130 a week, then to $205 and finally to $330. Miranda indicated that in all he paid some $6,500, but after many months of repayment he was still some $6,700 in debt. Miranda also testified that, when he had difficulty in paying these sums, Perez threatened him with hospitalization, harm to his family, the attention of persons higher in the moneylending chain, as well as an ominous "or else," if repayments should not be promptly forthcoming. Miranda hovered on the brink of insolvency, doubtless in large part because of the high payments to Perez, and was able to pay Perez only by obtaining meat on short-term credit, and then delaying his payments to suppliers. Finally driven to the wall, Miranda abandoned his business and fled to Puerto Rico, leaving his debts, legitimate and illegitimate, behind. On Miranda's return, appellant found him and again hounded him for further payment until appellant was arrested.

## I.

Appellant's principal contention is that the statute under which he was convicted is unconstitutional in prohibiting all extortionate credit transactions, without requiring a showing in a particular case of effect on interstate commerce, or connection with the Bankruptcy Act. The statute was enacted as Title II of the Consumer Credit Protection Act of 1968 and amended Title 18 of the United States Code by adding Chapter 42, sections 891–96, which deal with "Extortionate Credit Transactions." According to the legislative history, the statute was a far-reaching attempt to control "the vicious billion dollar a year loan-sharking racket," 114 Cong.Rec. 14384 (1968), and "a deliberate legislative attack on the economic foundations of organized crime." Conf.Rep.No. 1397, 90th Cong., 2d Sess. (1968), U.S. Code Cong. & Adm.News, p. 2029. Section 891 defines "extortionate extension of credit" as one characterized by an understanding of both the creditor and debtor that delay in, or failure to make, repayment "could result in the use of violence or other criminal means to cause harm to the person * * *." 18 U.S. C. § 891. Section 892(a) provides the heavy penalty of imprisonment for not more than 20 years or a fine of not more than $10,000, or both, for any person making such an "extortionate extension of credit." Subsection (b) of the same section provides various indicia of whether an extension of credit is extortionate, including an excessive interest rate, the inability of the creditor to legally enforce the debt, and the reasonable belief of the debtor that the creditor has used extortionate means to collect debts in the past. Section 893 prohibits the "financing" of extortionate extensions of credit, an obvious attempt "to make possible the prosecution of the upper levels of the criminal hierarchy." Conf.Rep.No. 1397, *supra*, U.S.Code Cong. & Adm.News at p. 2027. Finally, section 894(a)—the section involved here—punishes the actual collection or attempt to collect any extension of credit by "extortionate means." Section 894(a) (1) places the same heavy penalties used in section 892 on anyone who

(a) * * * knowingly participates in any way, or conspires to do

so, in the use of any extortionate means.

(1) to collect or attempt to collect any extension of credit * * *.

"Extortionate means" is defined in section 891(7) as

any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

It is clear from the above that the statute is a comprehensive federal attack on loan-sharking. Whatever may be the desirability of such national action, the question before us is whether Congress acted constitutionally.

## II.

We turn now to a consideration of the power of Congress under the Commerce Clause of the Constitution, which in Article I, section 8 authorizes Congress to regulate "Commerce * * * among the several States." As we understand appellant's argument, he concedes that Congress would indeed have power to reach the activities of Perez if it were shown that some instrumentality of commerce were used either to effect the threats or to repay the loan, or that the loan itself was in, or affected, interstate commerce, or was connected in some specific way therewith. According to appellant, however, Congress cannot regulate (at least by simple criminal prohibition) a wholly intrastate individual transaction without some proof in the criminal prosecution that the transaction is thus connected with interstate commerce; since that was not done here, the conviction cannot stand. While appellant's position has force, we cannot agree that congressional power is so limited.

■ We will concede at the outset that almost all federal criminal statutes

are so drafted that the connection with federal interests—the federal jurisdictional peg—must be proved in each case because such connection is incorporated into the definition of the offense. See, e. g., The Hobbs Act, 18 U.S.C. § 1951 (obstructing or affecting interstate commerce or movements of commodities in commerce by robbery or extortion).[1] But this hardly resolves the question whether such a mode of drafting is *constitutionally* required. We assume that all would agree that the reach of federal power under the Commerce Clause is not now niggardly construed and that statutes relying upon that clause frequently apply to intrastate activity. This is made clear by the series of decisions described in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), and Wickard v. Filburn, 317 U. S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and culminating in Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); and Maryland v. Wirtz, 392 U.S. 183, 192, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). In addition, these decisions support the proposition that individual proof of effect on interstate commerce is not required in each case, so long as Congress has made a rational overall determination.

In United States v. Darby, *supra*, 312 U.S. at 118, 61 S.Ct. at 459, the formulation put forward by Justice Stone was whether the regulation of intrastate activity was an "appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." This demands an evaluation, not of the effect of a particular item of intrastate activity on interstate commerce, but of the effect of intrastate activity, as a whole, on interstate commerce. A similar approach was apparent in Wickard v. Filburn, *su-*

---

1. See also 18 U.S.C. § 875 (transmitting kidnapping or extortion threats by means of interstate commerce); 18 U.S.C. § 2421 (transporting women in interstate commerce for prostitution, etc.).

*pra,* 317 U.S. at 127–128, 63 S.Ct. at 90, where the Court said:

> That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated is far from trivial.

The point was made even clearer by the decisions in *Atlanta Motel, McClung* and *Maryland.* In the first, the Court considered the constitutionality of Title II of the Civil Rights Act of 1964. Section 201(c) thereof, 42 U.S.C. § 2000a(c), conclusively declares, with exceptions not here important, that any motel "which provides lodging to transient guests" affects commerce *per se.* See *Atlanta Motel,* 379 U.S. at 247, 85 S.Ct. 348. To establish coverage under the Act in an individual case, there is no need to show that any particular guests are engaged in interstate travel; the congressional presumption of effect on interstate commerce is conclusive. In testing the constitutionality of the statute as applied to the Atlanta Motel, the Court did not look to proof of individual connection between the motel and interstate commerce. Instead it examined the basis of legislative action on the evidence available to Congress, pointing out, *id.* at 258, 85 S.Ct. at 358:

> The only questions are: (1) whether Congress had a rational basis for finding that racial discrimination by motels affected commerce, and (2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appropriate.

In Katzenbach v. McClung, *supra,* the Court again considered Title II of the Civil Rights Act, this time in its application to a restaurant as to which Congress did require, unlike motels, that a particular connection with interstate commerce be shown in the individual case; i. e., "a substantial portion of the food" served by the restaurant "has moved in commerce." However, appellants claimed that since the restaurant served only intrastate patrons, this was not enough to justify regulation under the Commerce Clause. As the Court put it, 379 U.S. at 303, 85 S.Ct. at 383, appellants

> object to the omission of a provision for a case-by-case determination—judicial or administrative—that racial discrimination in a particular restaurant affects commerce.

The Court rejected this argument, 379 U.S. at 303–305, 85 S.Ct. at 383:

> But Congress' action in framing this Act was not unprecedented. In United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941), this Court held constitutional the Fair Labor Standards Act of 1938. There Congress determined that the payment of substandard wages to employees engaged in the production of goods for commerce, while not itself commerce, so inhibited it as to be subject to federal regulation. The appellees in that case argued, as do the appellees here, that the Act was invalid because it included no provision for an independent inquiry regarding the effect on commerce of substandard wages in a particular business. (Brief for appellees, pp. 76–77, United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609.) But the Court rejected the argument, observing that:

> "[S]ometimes Congress itself has said that a particular activity affects the commerce, as it did in the present Act, the Safety Appliance Act and the Railway Labor Act. In passing on the validity of legislation of the class last mentioned the only function of courts is to determine whether the particular activity regulated or prohibited is within the reach of the federal power." At 120–121, 61 S.Ct. at 460.

> \* \* \* \* \* \*

Confronted as we are with the facts laid before Congress, we must conclude that [Congress] had a rational basis for finding that racial discrimination in restaurants had a direct and

adverse effect on the free flow of interstate commerce. * * * Congress prohibited discrimination only in those establishments having a close tie to interstate commerce, i. e., those, like the McClungs', serving food that has come from out of the State. We think in so doing that Congress *acted well within its power* to protect and foster commerce in extending the coverage of Title II only to those restaurants offering to serve interstate travelers or serving food, a substantial portion of which has moved in interstate commerce.

*The absence of direct evidence connecting discriminatory restaurant service with the flow of interstate food,* a factor on which the appellees place much reliance, *is not, given the evidence as to the effect of such practices on other aspects of commerce, a crucial matter.* [Footnote omitted; emphasis added.]

Finally, in Maryland v. Wirtz, *supra,* the Court considered the constitutionality of an extension of the Fair Labor Standards Act to cover all employees of an "enterprise" engaged in commerce or production for commerce. The argument was made that if only a few employees of an "enterprise" are so engaged, labor conditions in such a business "may not affect commerce very much or very often." To this, the Court replied, 392 U.S. at 192–193, 88 S.Ct. at 2022:

[W]hile Congress has in some instances left to the courts or to administrative agencies the task of determining whether commerce is affected in a particular instance, *Darby* itself recognized the power of Congress instead to declare that an entire class of activities affects commerce. The only question for the courts is then whether the class is "within reach of the federal power." The contention that in Commerce Clause cases the courts have power to excise, as trivial, indi-

vidual instances falling within a rationally defined class of activities has been put entirely to rest. Wickard v. Filburn, 317 U.S. 111, 127–128, [63 S. Ct. 82, 90–91, 87 L.Ed. 122]; Polish Nat. Alliance of United States of North America v. National Labor Relations Bd., 322 U.S. 643, 648, [64 S.Ct. 1196, 1199]; Katzenbach v. McClung [379 U.S. 294] 301, 85 S.Ct. 382 * * *. [Footnotes omitted.]

The Court went on to point out, 392 U.S. at 197 n. 27, 88 S.Ct. at 2024:

Neither here nor in *Wickard* has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities. The Court has said only that where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.

From these authorities, we conclude that whatever may have been the rule in earlier days, see generally, Schwartz, The Powers of Government, 178–237 (1963); Stern, The Scope of the Phrase *Interstate Commerce,* 41 A.B.A. J. 823 (1955), the present state of the law is that Congress can regulate intrastate transactions if a proper determination has been made that *as a class* such transactions affect or involve interstate commerce.[2] This conclusion is reinforced by the judicial treatment of the 1965 amendments to the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331(q), 360a, which make it a crime under certain circumstances to manufacture, process, sell or possess any depressant or stimulant drug. Like the statute here under attack, these amendments do not require a showing in each case that interstate commerce has been affected. Nevertheless, several circuit courts to date have sustained convictions thereunder in the face of the argument that such an individual showing is constitutionally required. See United States v. Cerrito,

2. See also United States v. Minor, 396 U.S. 87, 98 n. 13, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969).

413 F.2d 1270 (7th Cir. 1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L. Ed.2d 495 (1970); White v. United States, 399 F.2d 813, 823 (8th Cir. 1968); Deyo v. United States, 396 F.2d 595 (9th Cir. 1968); White v. United States, 395 F.2d 5 (1st Cir.), cert. denied, 393 U.S. 928, 89 S.Ct. 260, 21 L. Ed.2d 266 (1968).

■ The heart of appellant's argument in this case is that the Constitution requires that a determination be made in each prosecution under 18 U.S. C. § 894 that interstate commerce is involved and that this determination must be made in a judicial proceeding. We believe that the decisions cited above at pp. 1075–1077 indicate that neither proposition stands up. So long as a class of intrastate transactions considered as a whole has a substantial effect on interstate commerce, Congress can regulate a particular intrastate transaction in the class even though in that instance the effect on interstate commerce is minimal or non-existent. If this is so, then proof in that individual case that there was some connection with, or effect on, interstate commerce should not have constitutional significance. That Congress may require such proof in a particular case—as it frequently does but did not here—is a matter of legislative policy or drafting technique. But it should not be controlling on the constitutional issue whether the particular intrastate activity may be federally regulated. The crucial question instead is whether there is a rational connection between the class of such intrastate activities, sensibly defined, and interstate commerce.

Appellant places his main reliance on United States v. Five Gambling Devices, etc. (United States v. Denmark), 346 U. S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953), which involved a statute, 15 U. S.C. § 117, which required manufacturers and dealers in gambling devices to register and file periodic information. In that case, Mr. Justice Jackson, speaking for himself and two other justices stated that "penalizing failure to report information concerning acts not shown to be in, or mingled with, or found to affect commerce * * * raise[s] * * * a far-reaching question." *Id.* at 446–447, 74 S.Ct. at 193. Mr. Justice Clark, dissenting for four members of the Court, 346 U.S. at 462–463, 74 S.Ct. at 202 agreed that if Congress "had sought to *regulate* local activity, its power would no doubt be less clear," but nevertheless noted that:

[T]he situation here is unique: the commodity involved is peculiarly tied to organized interstate crime and is itself illegal in the great majority of the states, and the federal law in issue was actively sought by local and state law enforcement officials as a means to assist them, not supplant them in local law enforcement.

With all respect, it seems to us that all that both the opinions of Justices Clark and Jackson can be read to stand for is that the question is a substantial one. See Schwartz, op. cit. *supra*, at 236–37. We agree with the Court of Appeals for the First Circuit that the Supreme Court in *Atlanta Motel* has since indicated "its willingness in a proper case to approve legislation declaring that certain activities affect interstate commerce per se without requiring proof in each case." See White v. United States, 395 F.2d 5, 8 n. 3 (1st Cir.), cert. denied, 393 U.S. 928, 89 S.Ct. 260 (1968).

Therefore, it seems reasonably clear that Congress can regulate intrastate activity without any showing in a particular case that the activity affected interstate commerce, provided that a proper determination has been made that such intrastate activity, considered as a class, does have such effect and that the means selected to deal with it are reasonable and appropriate. To those questions, we now turn.

### III.

As enacted, the statute here under attack contained the following Findings and Declaration of Purpose: [3]

3. Section 201 of Pub.L. 90–321, 82 Stat. 146, 159 (1968).

(a) The Congress makes the following findings:

(1) Organized crime is interstate and international in character. Its activities involve many billions of dollars each year. It is directly responsible for murders, willful injuries to person and property, corruption of officials, and terrorization of countless citizens. A substantial part of the income of organized crime is generated by extortionate credit transactions.

(2) Extortionate credit transactions are characterized by the use, or the express or implicit threat of the use, of violence or other criminal means to cause harm to person, reputation, or property as a means of enforcing repayment. Among the factors which have rendered past efforts at prosecution almost wholly ineffective has been the existence of exclusionary rules of evidence stricter than necessary for the protection of constitutional rights.

(3) Extortionate credit transactions are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce. Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce.

(4) Extortionate credit transactions directly impair the effectiveness and frustrate the purposes of the laws enacted by the Congress on the subject of bankruptcies.

(b) On the basis of the findings stated in subsection (a) of this section, the Congress determines that the provisions of chapter 42 of title 18 of the United States Code are necessary and proper for the purpose of carrying into execution the powers of Congress to regulate commerce and to es-tablish uniform and effective laws on the subject of bankruptcy.

Thus, Congress found that a typical extortionate credit transaction is either itself in interstate or foreign commerce or affects such commerce, or uses the means and instrumentalities thereof. There is no reason to doubt that these findings of legislative fact are true. There was considerable evidence at congressional hearings or otherwise available to Congress, as the Conference Report on this legislation noted,[4] that organized crime monopolizes loan-sharking in the metropolitan areas of the country, that money flows into loan-sharking from other illicit activities regardless of state lines, and that the profits flow back into the other activities of organized crime, including the takeover of legitimate business. See The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Organized Crime, *passim*, particularly 2–3, 6–7, 11 (1967); Hearings on Impact of Crime on Small Business, S. Comm. on Small Business, 90th Cong., 2d Sess. (1968), particularly statements of Ralph Salerno and Henry Ruth, at 2–30. Moreover, the available evidence indicated that loan-sharking is so effective and lucrative because of high-level organization running across state lines, which eliminates competition between money-lenders in metropolitan areas and infuses threats of force with the respect which ordinarily only government can evoke. See *id.* at 20–21; Schelling, Economic Analysis and Organized Crime, Task Force Report: Organized Crime, *supra*, 114–26. Loan-sharking activities can persuasively be characterized as generally in or affecting commerce precisely because such practices depend for their full effect on monopoly in metropolitan areas and national, or at least multi-state, organization. This provided a logical basis for congressional focus on loan-sharking rather than on a variety of other crimes which may be far more "local" in nature, e. g., robbery, burglary, larceny. Task Force Report: Or-

---

4. Conf.Rep.No.1397, *supra*, U.S.Code Cong. & Adm.News, at p. 2026.

ganized Crime, *supra*, 2–4. The legislative history also shows recognition by Congress that the states alone cannot control organized crime, including loan-sharking,[5] while federal efforts are better able to do so. See generally, Note, Loan-sharking: The Untouched Domain of Organized Crime, 5 Colum. J. of Law and Soc. Prob. 91, 93–110 (1969).

██ Accordingly, it would seem that the congressional finding that even "purely intrastate" extortionate credit transactions affect interstate commerce is a rational one and that the means chosen to deal with loan-sharking are appropriate. We note that the same conclusion has recently been reached by the Court of Appeals for the Seventh Circuit. United States v. Biancofiori, 422 F.2d 584 (1970); accord, United States v. Curcio, 310 F.Supp. 351 (D.Conn. 1970). Appellant does not effectively challenge these overall congressional determinations, a burden he should have to assume but does not. Instead, he argues in general terms that 18 U.S.C. §§ 891, 894 go further than any earlier statute and conjures up hypothetical examples of money lending that would have no effect on interstate commerce. If by the first assertion appellant means that the reach of the statute is far broader than earlier regulation of intrastate commerce on the ground that it affects interstate commerce, the claim is not accurate. Nor should the fact that this is a criminal statute be controlling. Indeed, United States v. Darby, *supra*, was a criminal prosecution. What the argument is reduced to is that the failure to require proof in each case of effect on commerce is a fatal defect. For reasons already given, that contention is without merit. Equally unpersuasive is the con-

juring up in appellant's brief of innocent lenders suddenly enmeshed in federal criminal law; e. g.,

> [I]f someone borrows money from a friend, fails to repay it, and the lender loses his temper and threatens violence, a federal crime has occurred. More broadly, if a loan is made to a housewife, a lawyer, a doctor, a retail worker, or anyone in a host of occupations, that would have no impact on interstate commerce, or the most tenuous impact, a threat of violence to recover the debt becomes a federal crime.[6]

The examples are strangely reminiscent of dissenting opinions in earlier vindications of federal power over interstate commerce.[7] Apart from the dubious assumption that a loan from a "friend" would occasion a federal prosecution, Congress had the constitutional power to determine that the typical loan-sharking transaction has more than a "tenuous impact" on interstate commerce, and that it was necessary or appropriate to include all loan-sharking within the reach of the statute. Once Congress has made those determinations, we are bound by them unless they are irrational, even if the statutory language literally applies to a few atypical transactions not now before us. What is known as legislative fact for a class of transactions—the effect on interstate commerce —is not necessarily easily provable in an individual instance of loan-sharking. Trying to trace the flow of funds from the immediate enforcer to the organization behind the loan might well be impossible in a particular case. Money, of course, is a classic fungible commodity; showing its movement interstate may be completely impossible where all that

---

5. See 114 Cong.Rec. 14490 (1968) (Remarks of Sen. Proxmire). See also Hearings on the Federal Effort Against Organized Crime Before a Subcommittee of the House Committee on Government Operations, 90th Cong., 1st Sess. Part I at 68–69 (1967).

6. Appellant's brief, p. 22.

7. See, e. g., the dissent in NLRB v. Fainblatt, 306 U.S. 601, 610, 59 S.Ct. 668, 307 U.S. 609 (1939):
   If the plant presently employed only one woman who stitched one skirt during each week which the owner regularly accepted and sent to another state, Congressional power would extend to the enterprise, according to the logic of the Court's opinion.

moves is cash recorded, if at all, as an intangible on someone's records or in someone's memory. Cf. White v. United States, *supra*, 395 F.2d at 7. In short, while appellant's examples are not the kind of loans that occasioned the statute, the vague possibility that they may be technically covered by its language does not render the statute unconstitutional.

In conclusion: Congress has determined that all loan-sharking activities should be prohibited, that even those "purely intrastate in character * * * directly affect interstate and foreign commerce," and that the statute here involved is a necessary legislative response to eliminate an obvious evil. We do not feel justified in setting aside these determinations; we hold the statute constitutional.[8]

## IV.

Finally, appellant contends that the jury verdict was not supported by credible evidence because of contradictions in the testimony of Miranda. The evidence showed that on five separate occasions Perez threatened Miranda with the use of violence unless Miranda made payments on various loans that Perez had arranged for him. Miranda's testimony was corroborated in part by his wife and by one of his employees. Any contradictions were for the jury to consider in assessing his credibility.

Appellant also argues that a statement by the prosecution on summation improperly buttressed Miranda's testimony. Even if the statement was erroneous, the issue is not available on appeal since no objection was made. See United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U. S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

Appellant's contention that he was prejudiced by the failure of the prosecution to accept a defense stipulation as to appellant's signature on a check is equally without merit.

Judgment affirmed.

HAYS, Circuit Judge (dissenting).

In my opinion the conviction should be reversed because Congress exceeded its constitutional powers in enacting the statute on which the conviction was based.

## I.

I do not believe that the power to extend federal criminal law to cover extortionate credit transactions can be found in the Bankruptcy Clause. The statute is clearly not a uniform law on the subject of bankruptcy. Congress has sought to justify the statute on the ground that, if extortionate means are used to collect an extension of credit, the debtor may be deprived of his right to a discharge in bankruptcy. But this reasoning would lead logically to the conclusion that under the Bankruptcy Clause Congress could exercise complete control over all economic activity since almost any such activity might have some effect on a bankrupt's debts. The power of Congress under the Bankruptcy Clause does not appear to me to be capable of such an all-inclusive construction. Making a federal crime of every threat to collect or attempt to collect an extension of credit is not reasonably related to assuring debtors of their right to discharge in bankruptcy. The relationship is so artificial and tenuous that the power to enact the statute cannot properly be rested on the Bankruptcy Clause.

## II.

If the statute is valid it must be so because it is within the scope of con-

---

8. It is therefore unnecessary to deal with the Government's alternate contention that the statute is an "appropriate" exercise of congressional power to preserve the effectiveness of the bankruptcy laws, McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 409–420, 4 L.Ed. 579 (1819); see Conf.Rep. *supra*, U.S.Code Cong. & Adm.News, at 2025–26, although the Seventh Circuit has accepted this argument. United States v. Biancofiori, *supra*.

gressional authority to regulate interstate commerce.

But the statute does not require the government to prove, as an element of the crime, that either the threat of violence or the credit extension at issue had any effect whatsoever upon or any relation to interstate commerce. Although the Congressional findings refer to organized crime there is no requirement in the statute that the prosecution establish any connection between organized crime and the transaction which is condemned. Every instance of the use of extortionate means to collect an extension of credit is made a federal crime without regard to the relationship of the parties or their identity. Nor is there any requirement that the debt involved in the prosecution be of any particular nature or that any minimum amount be involved. Every trivial, insignificant and purely local act of the kind condemned is made a federal crime without any requirement of showing any connection with or effect upon interstate commerce. It is quite clear that not every extortionate act, no matter how small the debt involved, has any significant effect on interstate commerce.

There is no reason to believe that using threats to collect debts has any more effect upon interstate commerce than any other crime involving property. If extortionate conduct unrelated to interstate commerce can be made a federal crime, so can such crimes as robbery, burglary and larceny.

The statute here questioned is unprecedented in making a federal crime of conduct related to interstate commerce only by an assumed effect on such commerce. In all previous federal criminal statutes proof of some specific connection with interstate commerce such as movement across state lines or the use of some instrumentality of interstate commerce, such as the mails, has been required.

There is no Supreme Court case which suggests that Congress can ignore the requirement that some connection with interstate commerce must be established as a basis for conviction of a federal crime where the power of Congress to enact the statute is derived from the commerce clause. In United States v. Denmark, 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953), the constitutionality of Section 3 of the Johnson Act was in issue. That provision required "every manufacturer and dealer in gambling devices annually to register his business and name and monthly to file detailed information as to each device sold and delivered during the preceding month." Id. at 443, 74 S.Ct. at 191. An opinion written by Mr. Justice Jackson and joined by two other justices construed the Act as not applying to "purely intrastate matters." Id. at 450, 74 S.Ct. 190. To hold otherwise they said would raise "a far-reaching question as to the extent of congressional power over matters internal to the individual states." Id. at 447, 74 S.Ct. at 193.

Two justices, who concurred in the result, believed that the statute was too vague to be enforceable, but gave no sign of diagreement as to the constitutionality of its purported effect on intrastate transactions.

Four justices dissented stating their belief that the Act was intended to cover certain intrastate matters and that it was constitutional. However, they said at 462–463, 74 S.Ct. at 202:

"If Congress by § 3 had sought to regulate local activity, its power would no doubt be less clear. But here there is no attempt to regulate; all that is required is information in aid of enforcement of the conceded power to ban interstate transportation. The distinction is substantial."

Thus a clear majority of the Court doubted the constitutionality of an at-

tempt to "regulate" the intrastate activities of those engaged in commercial gambling. None of the justices upheld such power. In the statute now under consideration Congress has attempted to regulate the intrastate activities of those engaged in the crime of extortion.

In seeking to uphold congressional power to enact the statute, the majority relies principally on Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), Katzenbach v. McClung, 379 U. S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) and Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). Neither in these cases nor in any of the cases cited by the majority did Congress attempt as it has here to regulate intrastate crime. Moreover, in each of the three statutes involved in the cited cases Congress was careful to require a definite relationship with interstate commerce. In *Atlanta Motel,* the statute was made applicable only to motels which provide lodging to transient guests. In *McClung,* the restaurants were made subject to the statute only where a substantial portion of the food they served has "moved in commerce." In Maryland v. Wirtz, the employees covered by the statute were employees of enterprises engaged in commerce or in production of goods for commerce.

In the present case there is no requirement that the conduct sought to be regulated have any connection whatever with commerce. The mere use of the words "affects interstate commerce" cannot justify the abdication of judicial responsibility to interpret constitutional limitations on federal power. Here Congress has sought to use the Commerce Clause as a basis for criminal sanctions on purely local activity. I think that the prohibition of all extortionate credit transactions is not within the congressional power to regulate interstate commerce. I therefore respectfully dissent.