UNITED STATES of America

v.

Stephen MASIELLO, Hervey Edgar
Beckham and Bonnie
Thomas Carter.

Crim. No. 79–268.

United States District Court,
D. South Carolina,
Columbia Division.

June 4, 1980.

Eric W. Ruschky, Asst. U. S. Atty., Columbia, S. C., for the U. S.

Charles Porter, McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble, Columbia, S. C., for Masiello.

George W. Speedy, Furman & Speedy, Camden, S. C., for Beckham.

William R. Byars, Jr., Savage, Royall, Kinard, Sheheen & Byars, Camden, S. C., for Carter.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHAPMAN, District Judge.

This matter is before the Court upon the motion of each and all defendants pursuant to the Federal Rules of Criminal Procedure 12(b) and 41(f) to suppress certain evidence obtained as a result of a warrantless search of a suitcase and subsequent warrantless arrest of the three defendants. A hearing was held in this matter on January 4, 1980, at which time defendants Masiello and Beckham, with the consent of the government and approval of the Court, waived their right to a jury trial and agreed to have the Court render a final verdict pursuant to Federal Rules of Criminal Procedure 23(a). Defendant Carter did not waive his right to a jury trial and appeared only for the purposes of his motion to suppress.

All of the defendants are charged in Count I of the indictment with conspiracy to possess with intent to distribute and to distribute approximately nine thousand nine hundred (9,900) tablets of Methaqualone, a Schedule II non-narcotic controlled substance as set forth in 21 U.S.C. § 812, in violation of 21 U.S.C. § 841(a)(1). Count II of the indictment charges all three defendants with possession with intent to distribute the 9,900 tablets of Methaqualone in violation of 21 U.S.C. § 841(a)(1).

After weighing the evidence and studying the applicable law, the Court, pursuant to F.R.Crim.P. 23(c), makes the following

## FINDINGS OF FACT

1. On October 18, 1979, defendant Stephen Masiello was observed by Drug Administration Enforcement investigator Terry Mathewson in the Atlanta, Georgia airport. As a result of his observations, Agent Mathewson profiled Masiello as a possible drug courier.[1] Masiello's tickets, method of payment, and reservations were thoroughly checked as well as his credentials and it was determined by Agent Mathewson that Masiello should be stopped and questioned and possibly searched. Mathewson stopped Masiello, questioned him for a few moments, took him aside and searched his person. Mathewson asked if he could further search his bag which he had previously established as Masiello's and Masiello declined to give him permission. Masiello was also asked if DEA agents in Columbia, South Carolina, could search the suitcase when he arrived in that city and Masiello again refused to consent to such a search. Masiello was then released and he boarded his plane for Columbia.

2. Agent Mathewson then telephoned James Matthews, DEA agent in Columbia and told Matthews about the encounter with Masiello. He provided a description of Masiello and further informed Matthews of

---

1. The Drug Enforcement Administration has initiated a nationwide program to intercept drug couriers transporting illegal narcotics between major drug sources and distribution centers in the United States. As part of this program, DEA agents have formulated "drug courier profiles", that describe the characteristics often associated with narcotics traffickers. Agent Mathewson testified that the characteristics he used to profile Masiello included (1) the fact that Masiello flew into Atlanta from West Palm Beach, a city identified by the DEA as a "source city" for certain illicit drugs; (2) the fact that Masiello appeared to be in his mid-20's, which is the average age for drug couriers; (3) the fact that Masiello appeared to be very nervous; (4) the fact that Masiello used a one way ticket, which he paid cash for only three and one-half hours prior to departure; and (5) the fact that Masiello gave an incorrect call-back telephone number on his ticket.

Masiello's refusal to consent to a search of the suitcase.

3. After talking with Mathewson, Agent Matthews went directly to the Columbia Metropolitan Airport. He gave a complete physical description of Masiello to other drug enforcement officers and agents working at the Columbia Airport.

4. One of these officers was A. W. Watson, Jr., an investigator for the narcotics division of the Richland County Sheriff's Department. Watson was sent to the Columbia Airport to observe Masiello deplane. He and Agent Craig, a narcotics investigator with the South Carolina Department of Environmental Control, spotted Masiello as he left the plane and entered the airport terminal. As he entered the terminal, Masiello saw Watson and Craig, and did a "double-take" of the two officers. Agent Watson testified that at this point Masiello appeared very nervous and was obviously aware that he was being followed. Craig and Watson followed Masiello as he left the terminal gate area and walked to the second level of the airport terminal.

5. Meanwhile, Agent Matthews, along with several other drug investigators, including Christopher Kitts, a Lexington County narcotics investigator, had positioned themselves in the baggage claim area. Kitts, using the description provided by the Atlanta DEA agent, spotted Masiello with two individuals, defendants Carter and Beckham. The three defendants approached the baggage claim area and stopped approximately five or six feet from Kitts, whereupon Masiello handed Carter a small green piece of paper which was later identified as Masiello's luggage claim ticket. Masiello and Beckham then left the baggage claim area and walked to the airport parking lot. Kitts then notified Agent Matthews that Carter, and not Masiello, would be claiming Masiello's suitcase.

6. Agent Matthews kept a close watch over Carter as he waited for Masiello's suitcase to appear on the luggage conveyor belt. At this time, the majority of the passengers had already claimed their bags and departed. Carter was one of less than a handful of people in the claim area, and there was a very small amount of luggage left on the conveyor belt. As he waited for Masiello's suitcase to appear, Carter nervously looked around the claim area to see if he was being watched.

7. After several minutes, Masiello's bag appeared on the belt. Carter looked at the bag, which was positioned on the belt so that the claim ticket number was directly in front of him. In this position, Carter would have had no difficulty in determining the claim number on the bag. However, he let the suitcase go by and it continued its loop through the claim area. During the hearing, Carter testified that his reason for not picking up the suitcase when he first saw it was that he was not sure it was Masiello's bag. However, for reasons to be discussed below, the Court finds Carter's testimony totally lacking in credibility, and infers from his hesitancy in claiming the bag his desire to insure he was not being followed.

8. Carter continued his surveillance of the claim area. He was unable to "make" Agent Matthews and the other investigators watching him, so as the bag made its second trip around the belt, he quickly reached over, picked it up, and hurriedly proceeded toward the exit doors.

9. At this point, Agents Matthews and Craig, and investigator J. E. Clark, stopped Carter. Agent Craig identified himself as a narcotics officer, and advised Carter that the officers would like to question him. At Matthews' suggestion and with Carter's approval, the four men walked back to the airport's security offices for more privacy.

10. Carter testified that when he was stopped, one of the officers took the suitcase as the other agents handcuffed him. He stated that the handcuffs were not removed until he was in the security office. Agent Matthews testified, however, that Carter was not handcuffed until after he was arrested. The Court cannot accept Carter's version of his detainment. As noted previously, the Court is of the opinion that the greater portion of Carter's testimony was totally lacking in credibility. Such

a conclusion is warranted in light of Carter's preliminary testimony as to what he was doing in Columbia when he was arrested. Carter, a resident of Lancaster,[2] South Carolina, testified that he had stayed home from work that day because he had a migraine headache and was too ill to work. Yet, he further testified that despite his illness he was willing to drive Beckham from Lancaster to Columbia, arriving in Columbia during five o'clock rush hour traffic. Further, he indicated that he planned to return to Lancaster that evening in order to attend a three-hour night school class. Carter would have the Court believe that he was going to accomplish these things in spite of his migraine headache, which allegedly had rendered him too sick to work. Such a story justifies the Court's conclusion that Carter was lying repeatedly as he testified.

11. Once the officers had taken Carter to the airport security office, Agent Matthews introduced himself and investigator Clark, then Clark advised Carter that the officers were conducting an investigation which led them to believe that the suitcase Carter was carrying contained narcotics or controlled drugs. Carter stated that he did not know what was in the bag, and that he had been paid five dollars ($5.00) to pick up the bag by an individual he knew only as "Steve", who was waiting for him in the parking lot. Investigator Clark then advised Carter of his constitutional rights per *Miranda*. Carter handed Clark the baggage claim ticket and Clark, in turn, gave it to Matthews. The testimony indicates that throughout this period, none of the agents threatened Carter, nor did they make any promises to him to get him to talk. He was in fact, voluntarily cooperative in answering the questions of the officers.

12. At this point, an airport security guard came by and opened up a private conference room for the agents. Before they walked into the room, Agent Matthews asked Carter for consent to search the suitcase. He answered that "The bag is not mine. I don't care." and then walked into the conference room. Carter was then warned that if he did give consent to a search, and narcotics or contraband substances were found, that such substances could be used against him in a court of law. Carter replied that he understood this.

13. Matthews again asked Carter for consent to search the suitcase, warning, though, that he did not have to consent if he chose not to. Matthews further stated that if Carter did refuse, the officers would attempt to get a search warrant, but that they could not guarantee a search warrant would be forthcoming. Matthews was aware, at this time, that Investigator Clark had previously tried unsuccessfully to obtain a search warrant from a state magistrate.[3] Carter replied that he understood what would happen if a search warrant was obtained. Matthews then repeated his request for consent to search the bag and Carter again replied that he did not care if the suitcase was searched because he did not own it.

14. Matthews then told Carter that since he had been given the claim ticket to the suitcase, he had a "certain amount of custody and control over the bag." (Excerpt of testimony of James O. Matthews, January 3, 1980, pg. 12, line 25, page 13, line 1). He went on to state that the officers would need a "yes" or "no" answer and not an ambiguous one. He again warned that they would attempt to get a search warrant if he refused to consent, but that the issuance of a warrant was not guaranteed. This was repeated two or three times. Matthews then stated, "Mr. Carter, we need a yes or no answer." Carter replied, "Search it". (Excerpt of testimony of James O. Matthews, page 13, lines 12 through 13.) The interview with Carter lasted five to ten minutes.

15. The officers then opened the suitcase and found some men's clothing and

---

2. A distance of 56 miles.

3. The testimony during the hearing revealed that a county magistrate refused to issue the warrant because Investigator Clark could not specifically identify the type of drugs Masiello was thought to be carrying.

two brown grocery-type paper bags that were taped shut. These were opened and inside each one was discovered five clear plastic bags which contained a total of 9,900 white tablets. Subsequent tests on these tablets revealed that they were Methaqualone, a Schedule II non-narcotic controlled substance as set forth in 21 U.S.C. § 812. Carter was then arrested and searched. The search revealed that Carter had only three dollars on him, a fact indicating his claim that Masiello gave him five dollars to pick up the suitcase in the luggage area was fabricated.

16. Prior to Carter's arrest, Masiello and Beckham were followed by Captain Jackson J. Bowden of the Lexington County Sheriff's Department, pursuant to instructions from Investigator Kitts. They walked to the airport upper parking level and got into a black Buick automobile and drove to the lower level of the airport terminal front parking lot where they parked. Bowden followed them in his unmarked patrol car. He saw Beckham get out of the car and return to the terminal. Masiello then got out of the car and started running away from the terminal. Investigator Clark, who was with the group questioning Carter, was notified that Masiello was running away, so he instructed the officers following Masiello and Beckham not to allow them to leave the airport grounds. This occurred prior to the time the suitcase was opened. The airport police, riding in a marked police car which was parked within sight of the black Buick, chased Masiello for approximately two minutes. They finally stopped him near a private aviation company terminal and took him to the private conference room where Carter was being held. The suitcase was opened after Masiello was taken into custody.

17. Meanwhile, Beckham returned to the terminal in an apparent attempt to locate Carter. When he could not find Carter, he stepped into a restroom near the luggage claim area. At this point, officer Kitts entered the restroom, identified himself, and asked Beckham to come with him to answer some questions. Kitts assured Beckham that he was not under arrest.

Beckham consented to Kitts' request, so the two walked to the private conference room where Carter and Masiello were being held. Beckham was released into the custody of the other officers in the room. He was asked no questions and did not make a statement. The suitcase was already open when Beckham entered the room.

18. All three defendants were then placed under arrest and searched. Upon searching Masiello, the officers discovered an airline ticket which Masiello, in addition to the Methaqualone tablets, also seeks to have suppressed in this motion.

19. Following their arrest, defendants Beckham and Carter were provided forms containing their rights per *Miranda*. Both defendants read the statement of rights, and then signed a waiver of their right to have an attorney present during questioning. These statements were introduced into evidence during the hearing as Government's Exhibits Seven (7) and Eight (8). After signing the waiver forms, the two defendants made written statements concerning their presence at the Columbia airport on October 18, 1979. The gist of Carter's statement was that he had come to Columbia "to mess around." He stated he and Beckham went to the airport because they had been there before and they decided to have a drink there. However, Carter later testified that his purpose in going to the airport was merely to accompany Beckham who was going to pick up someone named "Steve". He also testified that he had never been to the airport prior to October 18, 1979. Thus, Carter's testimony clearly contradicts the written statement he made on October 18, 1979, and lends further support for the Court's conclusion that much of Carter's testimony was totally lacking in credibility. Beckham's statement was to the effect that he came to the airport to pick up an individual he knew only as Steve, and that he was unaware of anything that had to do with the arrest of the three defendants.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to 18 U.S.C. § 3231.

2. The basis of defendants' motion to suppress is that the warrantless search of the suitcase and subsequent warrantless search of each defendant violated the Fourth Amendment. It is well settled that a search conducted without a warrant issued upon probable cause is *per se* unreasonable under the Fourth and Fourteenth Amendments, subject only to certain clearly defined exceptions. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Included in these exceptions to the warrant requirement is the search of abandoned property. *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). This exception is based upon the rationale that one who abandons property has no standing to object to a search of that property. *Abel v. United States, supra; United States v. Jackson*, 544 F.2d 407 (9th Cir. 1976).

Masiello was originally stopped because he possessed many of the characteristics of the Drug Enforcement Administration's drug courier profile. The necessity for the use of such profiles in the effort to control the insidious drug abuse problem which presently plagues this country was recently recognized by Justice Powell in his concurring opinion in *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), wherein he noted:

The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement. At ——, 100 S.Ct. at 1881.

Justice Powell went on to describe the drug courier profile as "a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution." This Court wholeheartedly agrees with Justice Powell's description of this nation's drug problem and the DEA's drug courier profile program.

3. The first issue that must be addressed by the Court is the question of defendants' standing to object to the warrantless search of the suitcase. Normally, all three defendants would have automatic standing as a result of being charged with a possessory crime. *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). However, in the instant case, the Court believes that the actions of Masiello and Carter were an effective abandonment of the suitcase, and, therefore, neither has standing to move for suppression of the Methaqualone tablets.

4. In *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973), the en banc court provided the following definition of abandonment:

Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. (citations omitted).

The Court went on to state that "[T]he government may argue without self-contradiction that a defendant had possession at one time for purposes of conviction, but at a later time lacked sufficient possession to confer standing to object to search and seizure." 474 F.2d at 177. In Masiello's case, it is imperative to look at all the

surrounding circumstances in order to justify a finding that his flight from the airport parking lot away from the terminal and the suitcase constituted abandonment. First, Masiello knew he had been profiled as a possible drug courier as soon as he arrived in Atlanta. After his conversation with Agent Mathewson in Atlanta, Masiello knew that he would probably be followed by DEA agents once he arrived in Columbia. This fear was confirmed as soon as he passed through the arrival gate in Columbia and he "made" Agents Craig and Watson who were waiting for him to deplane. Once he realized that he was still being followed in Columbia, Masiello obviously attempted to mislead the agents by having Carter pick up his suitcase. Even while waiting for Carter in the airport parking lot, Masiello had to realize he was still being watched since officer Freeman was parked near Masiello's car in a marked police car. When Carter failed to return to the car with the suitcase, Masiello could only have concluded that Carter had been stopped, so he fled the airport terminal, leaving his companions and the suitcase.

5. In *United States v. Williams*, 569 F.2d 823 (5th Cir. 1978) the Court described a similar reaction by a person who knew he was being followed by government agents as "guilty flight". The conclusion that Masiello's running away was in fact "guilty flight" is even more justified here than it was in *Williams* since unlike the defendant in *Williams*, Masiello was actually told he was under suspicion of carrying controlled substances.

6. The obvious intent of Masiello in his guilty flight away from the airport terminal was to abandon his suitcase. Once he ran away, he could no longer retain a reasonable expectation of privacy with regard to the luggage. This is true even though he still owned the suitcase. Mere ownership alone is not enough to establish a reasonable and legitimate expectation of privacy. *United States v. Dall*, 608 F.2d 910 (1st Cir. 1979). It is reasonable to conclude that the last thing Masiello wanted to see once he fled the terminal was his suitcase. As a result of his abandonment of the suitcase,

Masiello lacks standing to challenge the subsequent warrantless search of the bag.

7. In addition to the evidence obtained from the warrantless search of the suitcase, Masiello further seeks to suppress the introduction of certain documents obtained as a result of a search of his person incident to his arrest. In the instant case, it is obvious that once the officers had discovered the Methaqualone tablets in Masiello's suitcase, they had probable cause to arrest him for a violation of 21 U.S.C. § 841(a)(1). The warrantless search of an individual conducted incident to his lawful arrest is a long-recognized exception to the warrant requirement of the Fourth Amendment. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Therefore, the warrantless search of Masiello's person following the arrest did not violate the Fourth Amendment, thus, his motion to suppress evidence obtained as a result of that search must be denied.

8. Having decided the defendant Masiello's motion to suppress must be denied for lack of standing, the Court must now decide whether Masiello violated 21 U.S.C. § 841(a)(1). To prove a violation of this section, the government must prove beyond a reasonable doubt that the defendant was in possession of a controlled substance and that he had the intent to distribute said controlled substance. Methaqualone is a Schedule II controlled substance within the meaning of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 812.

9. Though Masiello did not have actual physical possession of the suitcase and the Methaqualone tablets therein when arrested, there can be little doubt that he did have constructive possession of the drugs. He admitted to the DEA agent in Atlanta that the suitcase was his. Further, Carter testified that the suitcase belonged to a fellow he knew only as "Steve", said individual being later identified as Masiello. The evidence is clear beyond a reasonable doubt in this case that Masiello had possession of the Methaqualone tablets since he

knowingly had the power to exercise dominion and control over the tablets found in his suitcase. *United States v. Davis*, 461 F.2d 1026 (3rd Cir. 1972); *Amaya v. United States*, 373 F.2d 197 (10th Cir. 1967).

■ 10. The second element that must be proved in order to establish a violation of 21 U.S.C. § 841(a)(1) is that the defendant had the intent to distribute the controlled substance. In each case, the question of intent must turn on its own facts and the inferences which can be drawn from those facts.

Intent is not susceptible of direct proof; it must be proved by circumstances. The circumstances establishing such intent in a narcotic prosecution may properly consist of the quantity of the product involved, the nature of its packaging, and other relevant facts. *United States v. Childs*, 463 F.2d 390 at 392 (4th Cir. 1972).

The evidence revealed that Masiello possessed 9,900 tablets of Methaqualone. It is unlikely that Masiello could consume such a large quantity of drugs within a reasonable period of time. See *United States v. Cerrito*, 413 F.2d 1270 (7th Cir. 1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970). Further, the tablets were packaged in a manner that indicated they were not presently being used for personal consumption by Masiello. This evidence convinces the Court beyond a reasonable doubt that Masiello intended to distribute the tablets in his possession as that term is used in 21 U.S.C. § 841(a)(1).

11. The government has, therefore, established beyond a reasonable doubt each and every element of the offense charged in Count 2 of the indictment as to defendant Masiello. Defendant Masiello is adjudged guilty of the offense charged in Count 2 of the indictment.

## RONNIE THOMAS CARTER

■ 12. In regard to Carter's position, one can only interpret his statements to the agents once he was detained as abandonment of the suitcase. Carter twice stated that he did not own the suitcase, nor did he care what the agents did with it since he had no interest in it. There was no evidence whatsoever that Carter's statements were not made voluntarily. In *United States v. Miller*, 589 F.2d 1117 (1st Cir. 1978), the Court noted:

. . . that one who denies any interest in luggage has abandoned the property and thereby loses any standing to challenge an ensuing search. . . . we reach the same result by reasoning that one who disclaims any interest in luggage thereby disclaims any concern about whether the contents of the luggage remain private. (citations omitted).

13. The defendant in *Miller* had disclaimed any interest in four suitcases found in his vehicle which had been seized by DEA agents. He allowed the agents to open all four bags, even assisting with the combination lock on the fourth suitcase, in which was found two ounces of hashish. The Court held that as a result of his disclaimer of interest in the bags, the defendant had no standing to challenge the warrantless search.

14. More recently, in *United States v. Canady*, 615 F.2d 694 (5th Cir. 1980), the defendant was stopped at a passenger checkpoint by a private security guard, who asked if she could check the defendant's suitcase. He agreed, and assisted in opening the suitcase for the guard. In search of the luggage, the guard discovered two suspicious-looking cylindrical packages beneath some clothing, which she asked the defendant to open. With this request, the defendant became very nervous and denied ownership of the suitcase and the packages. He was told to return the suitcase to the ticket counter, but he instead tried to pass through another checkpoint at the other end of the terminal. At the second checkpoint he again assisted in opening the suitcase so that a security guard could search it. Once the cylindrical packages were discovered he again denied ownership of the bag. Since he could not pass through the checkpoint, he walked away from the checkpoint area, suitcase in hand, whereupon he was stopped by a policeman. The policeman questioned him about the suitcase and the

packages and the defendant again denied any interest in the suitcase. Thereupon, the policeman opened the bag and the packages, which were found to contain heroin. On appeal from the conviction for possession of heroin, the Fifth Circuit held that defendant, by disclaiming ownership of the suitcase had effectively abandoned the bag, therefore he had no legitimate expectation of privacy which would entitled him to challenge the search of the suitcase and the package. See also *Lurie v. Oberhauser*, 431 F.2d 330 (9th Cir. 1970); *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973); *United States v. Anderson*, 500 F.2d 1311 (3rd Cir. 1974).

15. Likewise, the Court finds that Carter's denial of any interest in the suitcase resulted in an effective abandonment of the bag. Thus, he had no reasonable expectation of privacy in the suitcase. He, therefore, has no standing to object to the subsequent warrantless search of the suitcase. His motion to suppress the evidence obtained as a result of this warrantless search must, therefore, be denied.

## HERVEY EDGAR BECKHAM

16. Unlike defendants Carter and Masiello, Hervey Beckham did not abandon the suitcase, thus he would have standing to move for suppression of the Methaqualone as a result of being charged with a possessory crime. The government has stipulated that if the Court finds that Beckham can properly move to suppress this evidence, then it will drop Count 2 of the indictment as to Beckham, and prosecute him only as to Count 1.

## CONSPIRACY COUNT

17. The first count of the indictment charges:

1. On or before the 18th day of October, 1979, the exact dates being unknown to the Grand Jury, in the District of South Carolina and elsewhere, STEPHEN MASIELLO, HERVEY EDGAR BECKHAM and RONNIE THOMAS CARTER, the defendants herein, unlawfully, knowingly and willfully did combine, conspire, confederate and agree together and have tacit understanding with each other and with divers other persons unknown to the Grand Jury, to possess with intent to distribute and to distribute approximately nine thousand nine hundred (9,900) tablets of methaqualone, a Schedule II Non-Narcotic Controlled Substance, as set forth in Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 841(a)(1).

2. It was a part of the said conspiracy that on the 18th day of October, 1979, STEPHEN MASIELLO would and did transport approximately nine thousand nine hundred (9,900) tablets of methaqualone from West Palm Beach, Florida, to Columbia, South Carolina.

3. It was a further part of the said conspiracy that HERVEY EDGAR BECKHAM and RONNIE THOMAS CARTER would and did meet STEPHEN MASIELLO at the Columbia Metropolitan Airport on October 18, 1979.

All in violation of Title 21, United States Code, Section 846.

18. That defendant Carter has not consented to a bench trial as to either count in the indictment and, therefore, there is no finding as to him in this Order on the charges contained in the indictment.

19. Under the law a conspiracy is a combination or agreement of two or more persons to join together to attempt to accomplish some unlawful purpose. It is known as "a partnership in criminal purposes" in which each member becomes the agent of every other member. The essence of the offense is a combination on mutual agreement by two or more persons to either disobey, or disregard, the law.

The evidence need not show that the alleged members of the conspiracy entered into any express or formal agreement; or that they directly stated between themselves the details of the scheme and its object or purpose, or the precise means by which the object or purpose was to be accomplished. Neither must it be proved that

all of the persons charged to have been members in the conspiracy were such, nor that the alleged conspirators actually succeeded in accomplishing their unlawful objectives. One may be a member of the conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. However, if a defendant, with an understanding of the unlawful character of the plan, knowingly and willfully joins in the unlawful scheme on one occasion that is sufficient to convict him of conspiracy even though he had not participated at earlier stages in the scheme and even though he played only a minor part in the conspiracy.

20. It is essential that the evidence in the case establish beyond a reasonable doubt:

(a) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

(b) that the defendant willfully became a member of such conspiracy;

(c) that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods or overt acts described in the indictment; and

(d) that such overt act was knowingly committed at or about the time alleged in an effort to accomplish or effect some object or purpose of the conspiracy.

An overt act is any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy.

21. With these fundamental principles of law in mind the Court concludes that the evidence in this case establishes beyond a reasonable doubt that the defendant Stephen Masiello and Hervey Edgar Beckham were members of a conspiracy, the purpose of which was to unlawfully distribute approximately 9,900 tablets of Methaqualone, a Schedule II Non-Narcotic Controlled Substance as set forth in Title 21, United States Code, Section 812. That while the conspiracy was in effect the defendant Stephen Masiello on October 18, 1979 did transport the 9,900 tablets of Methaqualone from West Palm Beach, Florida to Columbia, South Carolina and that as a further overt act said Stephen Masiello was met at the Columbia Metropolitan Airport on said date by defendant Hervey Edgar Beckham.

22. That both Stephen Masiello and Hervey Edgar Beckham are guilty of the charges contained in Count 1 of the indictment.

23. From the evidence before the Court the Court cannot find beyond a reasonable doubt that the defendant Hervey Edgar Beckham ever had actual or constructive possession of the tablets of Methaqualone and therefore it finds him not guilty on this charge.

IT IS, THEREFORE, ORDERED that the Clerk enter a judgment of guilty against the defendant Stephen Masiello as to both Counts 1 and 2 in the indictment; that the Clerk enter judgment of guilty against Hervey Edgar Beckham as to Count 1 and enter a judgment of not guilty as to Count 2.

IT IS FURTHER ORDERED that the motion of defendant Ronnie Thomas Carter to suppress the 9,900 tablets of Methaqualone be, and the same is hereby, denied.

AND IT IS SO ORDERED.