**UNITED STATES of America, Appellee,**

v.

**Robert DALL, Defendant-Appellant.**

**No. 79–1198.**

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1979.
Decided Nov. 13, 1979.

Francis M. Jackson, III, South Portland, Me., by appointment of the Court, with whom Nisbet, MacNichol & Ludwig, South Portland, Me., was on brief, for defendant-appellant.

Margaret D. McGaughey, Asst. U. S. Atty., Portland, Me., with whom George J. Mitchell, U. S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, DOOLING,* Senior District Judge.

DOOLING, Senior District Judge.

Appellant was convicted in the United States District Court for the District of Maine on a one count indictment charging him with participation in the interstate transportation of stolen goods in violation of 18 U.S.C. §§ 2314 and 2. Appellant moved before trial, on the record earlier made in a related case, to suppress the use in evidence against him of certain allegedly stolen antique furniture that had been seized in Rhode Island, by the Rhode Island State Police from a pickup truck registered in appellant's name. Judge Gignoux denied the motion to suppress, and the correctness of that ruling is the sole question presented on this appeal.

The facts are not in substantial dispute. On December 24, 1976, at about 10:30 a. m., Trooper Richard Hurst saw a blue Chevrolet pickup truck, fitted with a white "camper cap", heading north on the Post Road in North Kingston, Rhode Island, at a rate exceeding the speed limit; Hurst pursued and stopped the truck. There were three men in the cab. None of them had an operator's license with him, and only one of them had any identification with him—a card in a name other than his own. The driver, later identified as Richard B. Hudson, produced a Maine registration for the vehicle in the name of Robert Dall, the appellant. Appellant was not in the vehicle. The men in the vehicle with Hudson were Gary King and Michael Holmes, the man who produced "some sort of welfare card" in the name of Helms, saying, at first, that it was his name. Hudson told Hurst

* Of the Eastern District of New York, sitting by designation.

that he had a valid Maine operator's license but did not have it with him. Hurst tried unsuccessfully to have a computer check made on the vehicle and the three men through his cruiser radio; then, since none of the three had an operator's license, he requested them to go to the nearby police barracks to confirm their identities and the ownership of the truck, and they agreed to do so. At the barracks, the three men's names, dates of birth and addresses were taken down, and the trooper on the desk, recognizing the name Hudson, produced a police "flyer" indicating that Hudson was from Maine and had been involved in breakings and enterings, and stolen goods, and so forth, in Rhode Island and in the New England area. Preliminary investigation showed that none of the three men was wanted by the police in Rhode Island or elsewhere. They were detained, however, pending investigation, on the ground of their inability to identify themselves, and of their possession of an out-of-state motor vehicle without having a license to operate it.

At Hurst's request Detective Corporal Thomas Moffatt came to the barracks and interviewed the three men. Hudson told Moffatt that he had borrowed the truck from appellant in Maine on the preceding day to drive down to East Greenwich, Rhode Island, to see a friend, whom he named, and that he and his two companions had spent the night there. Hurst recognized the "friend's" name as that of someone said to be involved in breakings and enterings. Hudson said that his East Greenwich friend had not been at home, and that he and his companions were heading back to Maine when stopped.

Moffatt advised Hudson that their efforts to reach Dall by telephone had so far been unsuccessful. He also told Hudson that he had a bulletin, which he read to him, put out by the Lewiston police department, about his being a suspect in receiving stolen goods, such as antiques and rugs.

Hurst had meanwhile ascertained that the camper cap on the pickup truck was locked; when he looked into it as best he could by moving a louvered side window a little with his finger, he had seen that there was old furniture or antique furniture in the cap. Moffatt and Hurst asked Hudson if he would mind if they looked into the truck, and Hudson answered that he didn't have a key to get into the cap. Moffatt asked Hudson if he would sign a consent-to-search form for the truck, and Hudson said he definitely would not sign anything, that the stuff did not belong to him, that he didn't know what was in the cap, and that he hadn't looked in "there" or touched the back of the truck at all. Hudson, and, inferentially, the others, were advised that the truck would not be released to them, since none had a license with him, but that it would be impounded. The three were told that they would be released when their identities were confirmed, and that no charges would be brought if the owner confirmed that he had given them permission to have the truck.

Another attempt was made to reach appellant, again without success, and Hudson was then asked specifically if he had a key to the back of the camper. He said that he had only the ignition key, and that neither he nor the other two men had any keys to the cap. Hudson was then told that the police were impounding the truck, that it had to be inventoried, and that unless the police had a key they were going to have to pry up the fiber glass door at the back of the truck to lift out and inventory the contents. Before Hurst went forward with the formal impounding of the truck and inventorying its contents, Moffatt informed his superior, Detective Lieutenant Francis J. Martin, that the truck was going to be held until the owner came from Maine for it, and Martin told Moffatt to make sure that it was the owner in fact who did come to Rhode Island to pick up the truck.

Moffatt testified that he concluded that there were no criminal violations for the detectives to follow up on but only a motor vehicle violation, that he had not looked into the cap to see what it held, and that he turned the matter back to Hurst, telling him to seize the vehicle and hold it until the

owner contacted him. Moffatt then had Hurst open the back of the truck, remove the contents and place them in a safekeeping stall in the barracks garage. The contents were inventoried; the truck remained in the barracks parking lot.

The District Judge found, in accordance with the testimony of Moffatt, Martin and Hurst, that it was the regular practice of the Rhode Island State Police to impound a vehicle in a variety of circumstances, including instances in which an out-of-state driver is stopped, cannot produce an operator's license or identification and is driving a vehicle that belongs to someone else. The District Judge found that when a vehicle was impounded the regular practice was to secure it, to lock the vehicle, and to inventory the contents of the vehicle in order to protect the Department against allegations that property had been lost, damaged or stolen and also to make sure that there was no explosive or otherwise dangerous material in the vehicle. The evidence was, and the District Court found, that the parking lots at the barracks were not enclosed or fenced. There was testimony that the garage space inside the barracks building is not used for impounded vehicles but for police vehicles. Martin indicated that the contents of a vehicle that was being impounded were in State Police practice inventoried if the vehicle contained an unusual amount of goods or was to be kept in an area to which others had access.

About three or four o'clock in the afternoon, after the vehicle had been opened and its contents inventoried and stored, Hurst did reach appellant on the telephone. Appellant told Hurst that the truck was his and that he had lent it to Richard Hudson. Hurst explained that the truck had been stopped, that Hudson and the two men with him had no licenses or valid identifications, and that appellant would have to come to Rhode Island to claim the truck and show his ownership of any contents that might be in it. Appellant then said that the truck was empty when he had "just" lent it to "them" to use. Appellant said that he would come to pick up the truck, and later he did.

No charge was made against any of the three men by the Rhode Island police, and they were released at about 7 or 7:30 P.M., but a summons was issued to Hudson for driving without having an operator's license in his possession.

Judge Gignoux, after finding the facts in detail, concluded that the undisputed evidence established that appellant's pickup truck was legally impounded in accordance with standard procedures of the Rhode Island State Police, and that the search of the impounded vehicle was carried out in accordance with standard procedures of the Rhode Island State Police. He found accordingly, on the authority of *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and the cases following it, that the warrantless search of the pickup truck did not violate the Fourth Amendment. Having decided that the search was permissible under *Opperman* as a routine inventory search conducted in accordance with established police procedures, Judge Gignoux did not address the question of appellant's "standing", but he observed that *United States v. Nunn,* 525 F.2d 958, 959, *rehearing denied,* 527 F.2d 1390 (5th Cir. 1976), relied on by the United States Attorney as showing that appellant's personal rights were not violated by the search of the pickup truck, might well be considered inconsistent with the "standing" principles enunciated in *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

■ It is not necessary to consider whether police officers conducting a criminal investigation must put aside established inventory and security procedures and seek a warrant before proceeding further in the search of an impounded motor vehicle when the circumstances suggest that the vehicle contains the fruits or evidence of a crime. *Cf. United States v. Prescott,* 599 F.2d 103, 106 (5th Cir. 1979); *United States v. Edwards,* 577 F.2d 883, 893 (5th Cir. 1978); *United States v. Hall,* 565 F.2d 917, 922 (5th Cir. 1978). Judge Gignoux found on ample evidence that, by the time the truck was

914

impounded and its contents inventoried, Moffatt had concluded that the incident did not involve a criminal matter warranting further investigation, but, instead, was a routine traffic offense; for that offense a formal summons was issued to Hudson. Since appellant had confirmed Hudson's story that the vehicle had been lent to him, Hudson was not charged with theft or with unlawful possession of the vehicle. Neither Holmes nor King were charged with any offense. There was no criminal investigation afoot. Under *Opperman* the occasion was, therefore, a proper one for the Rhode Island police to secure the pickup truck and inventory its contents.

Appellant argues that since the camper cap was locked, it was already secure whether the truck was left in one of the open parking lots of the barracks or put into the police garage. But it was for the State Police to determine what security measures were appropriate, and the measures they took were those most consistent with the usual objectives in such cases—to protect the owner's property, to guard the police against unfounded claims over lost or stolen property, and to protect the police from potential danger (*South Dakota v. Oppermann, supra,* 428 U.S. at 369, 96 S.Ct. 3092).

■ In any case, the inventory search did not violate any rights of appellant. On his motion to suppress appellant had the burden of establishing that his Fourth Amendment rights were violated by the search and seizure. *Rakas v. Illinois,* 439 U.S. 128, 130–131, fn. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Simmons v. United States,* 390 U.S. 377, 389, 391, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Jones v. United States,* 362 U.S. 257, 261–262, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). There is no question here of "automatic standing". See *United States v. Salvucci,* 599 F.2d 1094, 1097 (1st Cir. 1979). Possession was not an essential element of the offense, for the indictment charged both the interstate transportation of stolen goods knowing them to have been stolen and aiding and abetting the commis-

sion of that crime (*United States v. Pellegrino,* 470 F.2d 1205, 1208–09 (2d Cir. 1972); *United States v. Tannuzzo,* 174 F.2d 177, 180 (2d Cir. 1949)).

To establish that his Fourth Amendment rights were violated, appellant relies on the stipulated fact that he was at all relevant times the owner of the pickup truck from which the goods were seized, combined with the circumstances that the camper cap was locked and the key not in the possession of Hudson or either of his companions. These facts do not suffice to establish that appellant had a constitutionally protected privacy interest in the cap when it was opened and its contents inventoried.

■ Ownership alone is not enough to establish a reasonable and legitimate expectation of privacy. Ownership is relevant to the inquiry, (*Rakas v. Illinois, supra,* 439 U.S. at 148, 99 S.Ct. 421; *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Hunt,* 505 F.2d 931, 937 (5th Cir. 1974)), but the total circumstances determine whether the one challenging the search has a reasonable and legitimate expectation of privacy in the locus of the search. *United States v. Dyar,* 574 F.2d 1385, 1390 (5th Cir. 1978); *United States v. Nunn,* 525 F.2d 958, 959 (5th Cir. 1976); see *United States v. Hunt, supra,* 505 F.2d at 937, 943.

*United States v. Mulligan,* 488 F.2d 732 (9th Cir. 1973), relied on by appellant, is an extreme case; the defendant there owned the vehicle searched, had simply parked it in another's driveway without authorizing the bailee to use it, and had advised the bailee that he was going to get the car that day (*id.* at 737). Unlike the present case, *Mulligan* was a case of a presently asserted possessory interest in an owned vehicle. *United States v. Kelly,* 529 F.2d 1365 (8th Cir. 1976), also cited by appellant, does not rest in its discussion of "standing" on ownership concepts but principally on the "target" theory drawn from *Jones v. United States, supra,* 362 U.S. at 261, 80 S.Ct. 725;

that theory was explicitly rejected in *Rakas* (439 U.S. at 133–138, 99 S.Ct. 421).*

Appellant argues his stipulated ownership, the locked cap, and Hudson's disclaimers of knowledge of the contents of the cap and of access to it constitute such an implicit assertion of privacy as must induce this court to recognize a legitimate expectation of privacy for the contents of the camper cap comparable to that recognized in *Arkansas v. Sanders,* —— U.S. ——, 99 S.Ct. 2586, 2593, 61 L.Ed.2d 235 (1978), *United States v. Chadwick,* 433 U.S. 1, 13, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), *United States v. Bloomfield,* 594 F.2d 1200 (8th Cir. 1979), and two pre-*Opperman* cases, *United States v. Lawson,* 487 F.2d 468, 475–477 (8th Cir. 1973), and *Williams v. United States,* 412 F.2d 729, 730, 734–735 (5th Cir. 1969). In *Sanders,* however, the Supreme Court recognized a significant difference between automobile searches into places that constitute "some integral part of the automobile", as in this case, and searches of separate containers, such as luggage placed in a vehicle. *Arkansas v. Sanders, supra,* 99 S.Ct. at 2592–2593. See also *Bloomfield, supra,* 594 F.2d at 1203 (knapsack in automobile). The already diminished expectation of privacy that attaches to motor vehicles is still further attenuated when the owner had given over possession to another for the other's own uses to the temporary exclusion of the owner. *Cf. United States v. Mendoza,* 473 F.2d 692, 695–696 (5th Cir. 1972); *United States v. Dyar, supra,* 574 F.2d at 1390; *United States v. Nunn, supra,* 525 F.2d at 959. The legitimate and reasonable expectation of privacy, then, attached to Hudson's possession and not to appellant's title, the symbol of which was also in Hudson's possession. That Hudson denied knowledge of the contents of the camper cap, and did not have a key for it, proved nothing. Hudson did not assert, for what that would have been worth, that appellant had locked the cap, or had retained the key, or that any contents of the truck belonged to appellant. The identity of the person who had loaded and locked the camper cap was a matter of speculation and no more.

■ When appellant was reached on the telephone after the inventory search, he asserted to Hurst that the truck was empty, that there was nothing in it, and that he had just lent it to "them" to use. These statements, coming after the search, would have been altogether irrelevant if the question had been whether there was probable cause to search. But the issue here is the identity of the person whose Fourth Amendment rights was invaded, if any right was invaded, and whose legitimate expectation of privacy was offended. On that issue evidence admissible against the appellant at a hearing on a motion to suppress would include statements relating to his privacy interest that he had made before the hearing. He could, under the protection of the *Simmons* case, deny the statements to which Hurst testified, or explain them, but he chose not to do so. The consequence is that the unexplained statements are strong evidence that appellant had no legitimate expectation of privacy with respect to a search of the camper cap. *Cf. Brown v. United States, supra,* 411 U.S. at 229–230, 93 S.Ct. 1565. In a word, appellant failed to sustain the burden of proving that he had a legitimate expectation of privacy in the camper cap: neither the testimony of the police witnesses nor the stipulation of title sufficed to support that burden.

*Affirmed.*

---

* *Kelly* has been criticized on other grounds. See *United States v. Sanders,* 592 F.2d 788, 792 (5th Cir. 1979); *United States v. Sherwin,* 539 F.2d 1, 7 (9th Cir. 1976).