NOT DESIGNATED FOR PUBLICATION

No. 118,393

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

EARL S. ROSS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed April 20, 2018. Affirmed in part and reversed in part.

*Rachel L. Pickering*, assistant district attorney, *Michael F. Kagay*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Thomas G. Lemon*, of Cavanaugh, Biggs & Lemon, P.A., of Topeka, for appellee.


Before LEBEN, P.J., GARDNER, J., and BURGESS, S.J.


PER CURIAM: The State of Kansas appeals the judgment of the Shawnee County District Court suppressing evidence obtained in the search of a vehicle owned by Earl S. Ross. The State contends that the district court erred in concluding that Ross possessed Fourth Amendment standing to challenge the search. This matter is affirmed in part and reversed in part.

1

On the morning of June 27, 2017, Shawnee County Sheriff's Deputy Brian Rhodd was parked on a cross-over median near the Valencia Road exit on I-70. The deputy's attention was drawn to a vehicle that slowed to about 50 miles per hour as it passed his parked patrol vehicle. Deputy Rhodd pulled onto the freeway to follow the vehicle and observed an obscured temporary tag. Deputy Rhodd pulled alongside the vehicle and glanced at the driver who was talking on a phone and appeared panicked. Deputy Rhodd allowed the vehicle to pull ahead of his vehicle and then stopped the car for the tag violation.

Deputy Rhodd approached the front passenger window and spoke to the occupants, who were later identified as 19-year-old Sarah Palmeri and 18-year-old Madalyn Hope Nelson. In order to hear the driver over the highway noise, Deputy Rhodd ducked his head toward the open passenger window. He smelled only cigarette smoke and Monster energy drink. Deputy Rhodd asked for a driver's license and vehicle registration from Palmeri and identification from Nelson. While the young women were locating these documents, the deputy questioned them about their point of origin and destination. Palmeri told Deputy Rhodd that they lived in Colorado but were traveling to Kansas City to visit their grandmother. Deputy Rhodd believed that the story was rehearsed. Nelson volunteered that the car belonged to a friend named "Earl." Eventually, both women provided Colorado driver's licenses and the registration for the vehicle. The registration indicated that Earl Steffan Ross owned the vehicle. Deputy Rhodd returned to his patrol vehicle to run the information through dispatch.

Before running the licenses through dispatch, Deputy Rhodd used his cell phone to call a K-9 unit. Dispatch reported that both licenses were current and that there were no warrants attached. Deputy Rhodd filled out a warning citation for the tag violation and returned to the passenger side of the stopped vehicle. He asked Palmeri to join him at the

rear of the vehicle to show her the tag violation. He returned the licenses and vehicle documentation and signaled the end of the traffic stop by telling Palmeri to have a good day and shaking her hand. Deputy Rhodd and Palmeri exchanged pleasantries, and the officer stepped away.

Deputy Rhodd immediately turned back to Palmeri and requested permission to ask a "couple more questions." Palmeri consented, and Deputy Rhodd asked whether they were carrying anything illegal, such as marijuana, heroin, methamphetamine, illegal weapons, or illicit cash. Palmeri denied that they were carrying any of the contraband Deputy Rhodd listed. Deputy Rhodd then requested consent to search the car. Palmeri conceded that she had the authority to permit a search but declined to authorize Deputy Rhodd to search the vehicle. Deputy Rhodd told Palmeri that a "guy coming with a dog" was on his way to the traffic stop and asked whether Palmeri would be willing to wait until he arrived. Palmeri replied, "Sure."

Deputy Rhodd instructed Palmeri to return to her vehicle, and Deputy Rhodd returned to his vehicle to wait for the K-9 unit to arrive. The K-9 unit arrived approximately 10-15 minutes after Deputy Rhodd had called and about five minutes after Deputy Rhodd returned to his patrol vehicle. When the K-9 unit arrived, Deputy Rhodd returned to Palmeri's car and asked both occupants to join him again at the rear of the vehicle. Deputy Rhodd requested Palmeri to lift her sweatshirt above her waistline so that Deputy Rhodd could check whether she was carrying any contraband or weapons in the waistband of her pants. Deputy Rhodd saw a small, green, zippered cloth bag and took it from Palmeri. Deputy Rhodd testified at the suppression hearing that he opened the bag and smelled marijuana, but the videos clearly show that Deputy Rhodd did not open the bag until after the search of the vehicle. Deputy Rhodd testified that he felt the contents of the bag and determined that the bag did not contain weapons but contained something hard.

3

Immediately after taking Palmeri's bag, Deputy Rhodd took Nelson's phone and returned it to the front passenger seat of their car. As he returned to the back of the car, Deputy Rhodd tossed Palmeri's bag to the other deputy, stating that he did not need the dog. Deputy Rhodd directed the two women to stand on the shoulder next to his patrol vehicle with the other law enforcement officers. Then Deputy Rhodd opened the driver's door and began to search their vehicle. After a preliminary search of the interior, Deputy Rhodd asked Palmeri how to open the trunk, and she told him that she did not know. In searching the back seat, Deputy Rhodd discovered an access panel into the trunk. Reaching in through the access door, he found a nylon-sided suitcase, managed to open it, and retrieved some of its contents, ascertaining that the bag contained packaged marijuana. Deputy Rhodd arrested Palmeri and Nelson and eventually transported them to the law enforcement center in Topeka.

Due to the interlocutory nature of these proceedings, the evidence supporting the criminal charges against Ross are substantially less developed. According to the probable cause affidavit supplied by Deputy Rhodd, the officers conducted an additional search of the trunk after finding an emergency trunk release once the car had been hauled to the law enforcement center. The officers found four suitcases in the trunk, containing separately vacuum-sealed bags of marijuana weighing a total of 60.85 pounds. The bags also held 70 grams of butane honey oil (BHO).

During separate interviews with Palmeri and Nelson, Deputy Rhodd learned that Palmeri had been hired by Ross to drive his vehicle across Kansas and pick him up at the Kansas City International Airport. It is not clear whether Palmeri and Nelson would join him, but Ross allegedly intended to drive to Springfield, Missouri, to deliver the marijuana to distributors. Eventually, Palmeri was to return Ross to the Kansas City airport and then drive with Nelson back across Kansas with the proceeds of the sale of marijuana. Palmeri admitted that she had done this on at least one other occasion. A receipt from the Kansas Turnpike Authority dated June 14, 2017, was discovered in the

4

vehicle's interior. Palmeri received $500 after each trip. Nelson provided Deputy Rhodd with a similar story. Palmeri and she were supposed to pick up Ross at the Kansas City airport and that they were to carry money back from Springfield. Nelson reported that she made $200-$300 on a previous trip. When Deputy Rhodd asked about the marijuana, Nelson requested an attorney, and Deputy Rhodd terminated the interview.

The State charged Ross with two counts of conspiracy to distribute or possess with the intent to distribute marijuana in an amount between 450 grams and 30 kilograms. The State cited Ross' provision of a car for transport as the overt act in furtherance of the conspiracy. The State also charged Ross with the use of drug paraphernalia for providing the vehicle the women were using to distribute a controlled substance.

Prior to trial, the State and Ross filed several pretrial motions, none of which are particularly pertinent to this appeal except the motion to suppress. The suppression motion requested the district court "to suppress all evidence from the contents of the vehicle." The motion focused on the unreasonable nature of Deputy Rhodd's search of the occupants of the vehicle and of the vehicle. The motion did not address Ross' standing to challenge the search and specifically did not challenge the admission of Palmeri's and Nelson's statements to law enforcement as fruit of the allegedly illegal search.

The State did not file a written response to Ross' motion. At the suppression hearing on September 5, 2017, Deputy Rhodd presented the only testimony. Following the presentation of his testimony and the admission of videos of the traffic stop, the State argued that Ross lacked standing to challenge the search. The district court disagreed and suppressed the evidence obtained as a result of the search. The district court's ruling did not specifically address what evidence was to be suppressed.

On September 13, 2017, the State filed its notice of interlocutory appeal.

ANALYSIS

*Does this court possess jurisdiction over this interlocutory appeal?*

As a preliminary matter, the State attempts to bring an interlocutory appeal from the suppression ruling pursuant to K.S.A. 2017 Supp. 22-3603, which provides:

> "When a judge of the district court, prior to the commencement of trial of a criminal action, makes an order quashing a warrant or a search warrant, suppressing evidence or suppressing a confession or admission an appeal may be taken by the prosecution from such order if notice of appeal is filed within 14 days after entry of the order. Further proceedings in the trial court shall be stayed pending determination of the appeal."

Here, the district court clearly suppressed evidence obtained as the result of an illegal search. The plain language of K.S.A. 2017 Supp. 22-3603 supports appellate jurisdiction over the State's appeal from the district court's order of suppression. But the Kansas Supreme Court has previously read the statutory provision more narrowly, holding that interlocutory appeals by the prosecution are limited to rulings on pretrial motions that may be determinative of the case. In order to justify appellate review of an interlocutory suppression order, the State must be able to demonstrate that the order substantially impairs the State's ability to prosecute the case. *State v. Newman*, 235 Kan. 29, 35, 680 P.2d 257 (1984). A substantial impairment undermines the State's ability to establish a legally sufficient case. *State v. Guy*, No. 116,983, 2017 WL 3202977, at *2 (Kan. App.) (unpublished opinion), *rev. denied* 306 Kan. 1324 (2017); *State v. Dearman*, No. 110,798, 2014 WL 3397185, at *4 (Kan. App. 2014) (unpublished opinion).

6

Neither party raises this issue, but appellate jurisdiction may be raised at any time, including by the court on its own initiative. See *State v. Tims*, 302 Kan. 536, 540, 355 P.3d 660 (2015). The right to appeal is entirely statutory and is not contained in the rights provided by the United States Constitution or the Kansas Constitution Bill of Rights. Subject to a few limited exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statute. *State v. Smith*, 304 Kan. 916, 919, 377 P.3d 414 (2016). When the State attempts an interlocutory appeal from a suppression ruling, it should be prepared to demonstrate how the suppressed evidence impairs its ability to prosecute on order of the appellate court or on a challenge by the criminal defendant. The burden of establishing the propriety of interlocutory appellate review rests with the State. See *Newman*, 235 Kan. at 35.

There are two ways that the district court's suppression ruling might substantially impair the State's ability to prosecute Ross for conspiracy to distribute marijuana and use of his vehicle as drug paraphernalia. First, the suppression ruling might extend to all evidence obtained by law enforcement as fruit of the illegal search, including Palmeri's and Nelson's statements to law enforcement. Second, the evidence of marijuana found in the trunk is essential to establish one or more of the elements of the charged offenses.

*Fruit of the poisonous tree*

Evidence obtained directly or indirectly as a result of an illegal search is subject to exclusion as fruit of the poisonous tree. See *Oregon v. Elstad*, 470 U.S. 298, 305-06, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *Dunaway v. New York*, 442 U.S. 200, 217-18, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). But indirect fruit of an illegal search must be suppressed only when it has been obtained by exploitation of the illegal search rather than by means sufficiently distinguishable from the search to be purged of the primary taint. *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). In other words, suppression is not required when statements by an individual are sufficiently

7

attenuated from the illegal conduct to remove the taint of the illegal conduct. See *New York v. Harris*, 495 U.S. 14, 19, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990). Factors used to determine attenuation are (1) whether the officers observed the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (2) the temporal proximity of the arrest and the confession; (3) the existence or absence of intervening circumstances; and (4) the purpose and the flagrancy of the official misconduct. *Kaupp v. Texas*, 538 U.S. 626, 633, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003); *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

Resolution of these factors necessarily requires factual inquiry that this court is not equipped to address on this record. See *Kaupp*, 538 U.S. at 633 ("Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State."). Unfortunately, the scope of the district court's suppression ruling is unclear because it did not specifically address what evidence was encompassed by its ruling. More specifically, the order did not indicate whether the statements of Palmeri and Nelson were suppressed as fruit of the illegal search. If the district court had ruled that Palmeri's and Nelson's statements should be suppressed, the impairment to the State's ability to prosecute would be obvious. Since the State has not challenged the scope of the district court's suppression ruling, this court lacks the benefit of the parties' interpretation of the district court's ruling.

This court may not simply presume that the statements were purged from the taint of the illegal search, but the court should also not presume that the suppression ruling covered the statements made by Palmeri and Nelson. Without specifically articulating the scope of the suppression ruling, the district court did not provide the parties with an opportunity to argue the appropriate scope of the suppression ruling. Accordingly, this court may not presume the existence of jurisdiction when the record fails to demonstrate that the statements are encompassed by the suppression ruling.

8

*Requisite evidence*

Assuming, without deciding, that the statements would be admissible as sufficiently attenuated from an illegal search of the vehicle, the State may further establish that the suppression ruling compromised its ability to prosecute Ross by showing that the physical evidence suppressed as a result of the illegal search compromised its ability to satisfy an essential element of one of the charges brought against Ross, neither of which involve possession of a controlled substance. Instead, Ross was charged with conspiracy to distribute marijuana and use of his vehicle as drug paraphernalia. Both of these charges are substantially supported by Palmeri's and Nelson's statements to law enforcement. During interviews with Deputy Rhodd following their arrest, Palmeri and Nelson both made statements incriminating Ross in soliciting their assistance to traffic marijuana. It is this testimony rather than the evidence obtained in the search of the vehicle that forms the basis for the charges against Ross.

With respect to the drug paraphernalia charge, Palmeri's statements that Ross hired her to drive his car across Kansas to distribute marijuana in Springfield, Missouri, is sufficient to establish the crime, especially considering Palmeri's testimony that she had driven Ross' car on at least one other occasion for the same purpose. The amount of marijuana discovered in the vehicle might support a presumption of an intent to distribute which would strengthen the case that the vehicle was being used as drug paraphernalia for distribution. However, the evidence does not appear to be essential to a prosecution of the charged offense.

Similarly, in order to prove conspiracy to distribute marijuana, the State was also required to rely primarily on the testimony of Palmeri and Nelson, as to the existence of an agreement and as to the overt act—providing the vehicle for Palmeri and Nelson to use to transport the marijuana. See K.S.A. 2017 Supp. 21-5302(a). However, unless Palmeri and Nelson knew how much marijuana was in the trunk, the State necessarily

had to provide evidence of the quantity because the quantity of drugs established the underlying offense the parties conspired to commit. The underlying drug crime carries different penalties depending on the amount of drugs at issue.

The evidence in the record suggests that Nelson had no idea that they were transporting any marijuana. Palmeri clearly knew that they were transporting marijuana for distribution, but she told Deputy Rhodd that she could not access the trunk and did not know how much marijuana Ross had stored there. Based on this evidence, the district court's suppression ruling, even if limited only to the marijuana found in the trunk, substantially impaired the State's ability to establish a prima facie case for the conspiracy charges. Interlocutory appellate review of the suppression ruling is appropriate. This court possesses jurisdiction.

*Does Ross possess a sufficient expectation of privacy in the vehicle to challenge its search?*

The sole remaining issue presented to this court is whether the district court properly concluded that Ross possessed Fourth Amendment standing to challenge the search of his vehicle.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and § 15 of the Kansas Constitution Bill of Rights protect individuals from unreasonable searches or seizures by the government. *Skinner v. Railway Labor Executives' Assn*, 489 U.S. 602, 619, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989); *State v. Baker*, 306 Kan. 585, 589-90, 395 P.3d 422 (2017). The protections found in § 15 of the Kansas Constitution Bill of Rights are generally interpreted the same as the rights provided by the Fourth Amendment. See *State v. Thompson*, 284 Kan. 763, 779, 166 P.3d 1015 (2007) ("Kansas counts among the majority of states which have construed state constitutional provisions in a manner

10

consistent with the United States Supreme Court's interpretation of the Fourth Amendment.").

Nevertheless, the rights protected by the Fourth Amendment and § 15 are personal and may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *State v. Talkington*, 301 Kan. 453, 476, 345 P.3d 258 (2015).

> "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable, *i.e.*, one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Minnesota v. Carter*, 525 U.S. 83, 89, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998).

See also *Talkington*, 301 Kan. at 477 (citing *State v. Robinson*, 293 Kan. 1002, 1014, 270 P.3d 1183 [2012]). The individual claiming protection of the Fourth Amendment bears the burden of establishing that the allegedly illegal search or seizure constituted a violation of his or her Fourth Amendment rights rather than someone else's rights. *Talkington*, 301 Kan. at 476.

Although commonly referred to as Fourth Amendment standing, the term "standing" is actually a misnomer. See *Carter*, 525 U.S. at 88 ("[I]n determining whether a defendant is able to show the violation of his [and not someone else's] Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'") (quoting *Rakas*, 439 U.S. at 140). Nevertheless, Kansas appellate courts and both parties have characterized the principles as Fourth Amendment standing. See *Talkington*, 301 Kan. at 476; *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

11

The record does not contain a written suppression order by the district court. The parameters of the district court's oral ruling on Fourth Amendment standing is a bit difficult to ascertain. The district court clearly found that Ross possessed the ability to challenge some aspects of the search but did not clearly define the scope of Ross' standing.

"I'm going to rule in the standing issue. She really—the owner of the car maintains some interest in the car, and the driver really never—never consented to a search. She consented to wait. She consented to wait for the dog. And while they were waiting for the dog, which, by the way, was called off, so there—there never was a search by the dog, which was, essentially, the only thing that she agreed to do, was wait for the dog. Then at that time she was ordered to get out of the car, ordered to pull up her shirt. [Deputy Rhodd] grabbed the package and none of that was with—with the consent of the driver. So I don't think that—that standing is an issue in the context of this case. And so the standing argument is overruled."

The State contends that Ross had the burden of initially establishing Fourth Amendment standing and that he failed to do so because his motion to suppress characterized his ownership of the vehicle as an allegation rather than fact. While a criminal defendant may testify at a suppression hearing to establish standing to challenge a search without jeopardizing his or her trial defenses, nothing in Fourth Amendment jurisprudence requires a criminal defendant to admit ownership of a vehicle where other evidence conclusively establishes ownership. See *Talkington*, 301 Kan. at 476 (citing *State v. Gonzales*, 32 Kan. App. 2d 590, 593, 85 P.3d 711 [2004]). Ross has never denied ownership of the vehicle.

Deputy Rhodd testified that either Palmeri or Nelson claimed that the car belonged to "Earl" and provided an address for that individual. This information was confirmed by the vehicle registration. Despite Ross' characterization of himself as the alleged owner of the vehicle, his ownership is not in dispute. Furthermore, the State's legal position is not

12

served by calling into question Ross' ownership. The drug paraphernalia charge depends on Ross' use of the car to transport controlled substances. His ownership of the vehicle strengthens the State's case in that regard since he was not present at the time Palmeri and Nelson were arrested.

The primary issue on appeal, therefore, is whether the circumstances surrounding Ross' ownership, but lack of possession, of the vehicle at the time of the stop establish a sufficient expectation of privacy in the vehicle to afford Ross standing to challenge the search of the vehicle. It is clear that Ross lacks a sufficient expectation of privacy in the persons of Palmeri or Nelson to challenge Deputy Rhodd's searches of their persons. *United States v. Myers*, 102 F.3d 227, 231 (6th Cir. 1996) ("[W]hen a defendant is aggrieved by an allegedly illegal search of a third party's person or property, the Fourth Amendment rights of that defendant have not been infringed."). Furthermore, as Ross was not present for the traffic stop, he lacks Fourth Amendment standing to challenge Palmeri's and Nelson's seizure. See *Brendlin v. California*, 551 U.S. 249, 256-59, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007) (any occupant of a vehicle is seized within the meaning of the Fourth Amendment); *J.B. v. Washington County*, 127 F.3d 919, 928 (10th Cir. 1997) (holding that a parent of a child may not assert a derivative or vicarious Fourth Amendment claim for illegal seizure of a minor child).

Fourth Amendment standing has two components: an actual or subjective expectation of privacy in the area searched and an objectively reasonable expectation of privacy, i.e., one that society is prepared to recognize as reasonable. *New Jersey v. T.L.O.*, 469 U.S. 325, 338, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985); *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); *Talkington*, 301 Kan. at 477; *State v. Robinson*, 293 Kan. 1002, 1014, 270 P.3d 1183 (2012).

As a starting point, it is clear that a person who has no ownership or possessory interest in a vehicle may not contest a search of that vehicle. See *State v. Epperson*, 237

Kan. 707, 716-17, 703 P.2d 761 (1985); *State v. Davis*, 31 Kan. App. 2d 1078, 1082, 78 P.3d 474 (2003). Implicit in this statement is the converse proposition: a person who may establish an ownership or possessory interest in a vehicle generally has the ability to challenge the constitutionality of a search of that vehicle. *United States v. Wisniewski*, 358 F. Supp. 2d 1074, 1085 (D. Utah 2005) ("It is well settled that an owner of a vehicle manifests a subjective expectation of privacy in his car and that society considers that expectation objectively reasonable."). There is no question that Ross is the owner of the vehicle at issue in this case.

The question remains as to whether the loan of the vehicle to Palmeri and Nelson for a cross-country road trip erased any expectation of privacy Ross may have had as owner of the vehicle. An owner may abandon an expectation of privacy in a vehicle when the claim of ownership is abandoned either by disclaiming ownership in the vehicle or in circumstances suggesting abandonment of the vehicle. See *United States v. Burbage*, 365 F.3d 1174, 1178 (10th Cir. 2004) ("'The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object.'"). This court has previously examined the ability of a nonpresent owner to challenge a search in terms of abandonment. See *State v. Bartlett*, 27 Kan. App. 2d 143, 149-50, 999 P.2d 274 (2000).

*Bartlett* stands for the proposition that the owner did not extinguish an expectation of privacy in his vehicle because the loan of the vehicle was for an errand of short distance and duration. 27 Kan. App. 2d at 150. The State infers from that finding that a loan of a vehicle for an errand of long distance and duration diminishes the expectation of privacy. The inquiry into whether a vehicle owner has relinquished his or her expectation of privacy is necessarily a fact inquiry given the totality of the circumstances. *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983) ("An expectation of privacy is a question of intent, which 'may be inferred from words spoken, acts done, and other objective facts.' 'A finding of abandonment is reviewed under the clearly erroneous standard.' [Citations omitted.]"). The distance and duration of a loan of a vehicle is

14

simply one factor the court may consider when determining whether an expectation of privacy has been abandoned by the owner of a vehicle.

Nothing in the circumstances of this case suggest that Ross subjectively intended to abandon the vehicle and its corresponding expectation of privacy. According to the only information the court possesses, Ross was the registered owner of the vehicle. He loaned the vehicle to Palmeri and Nelson for the specific purpose of driving from Denver to Kansas City where they would pick him up at the Kansas City airport. Presumably, whether Palmeri and Nelson continued the trip to Springfield or not, Ross would regain control over his vehicle after the young women picked him up in Kansas City. Thereafter, he would again lend the vehicle to Palmeri and Nelson for the specific purpose of driving back across Kansas to Denver where the car would be returned to him. Nothing about these circumstances demonstrates Ross' subjective intent to abandon his car with its attendant expectation of privacy. In addition, the trunk of the car was locked in such a manner that Palmeri and Nelson were prohibited access. Further, the bags found in the trunk were securely locked. This is an indication of an attempt by Ross to ensure privacy to that area of the car and those items in the trunk.

The question remains whether society would recognize as reasonable a continued expectation of privacy in the locked contents of a trunk when a car is loaned to two teenage girls for a cross-country trip of a minimum of two to three days. Clearly, Ross has abandoned any expectation of privacy that society would recognize as reasonable in the contents of the vehicle accessible to Palmeri or Nelson during their use of the vehicle. *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) ("Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside."); *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *United States v. One 1986 Mercedes Benz*, 846 F.2d 2,

15

4 (2d Cir. 1988) ("We believe that by lending the Mercedes to [driver], [owner] abandoned any legitimate expectation of privacy in the area searched and thus may not now contest the legality of the search."); *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 449 (9th Cir. 1983) (where owner voluntarily turned her automobile over to driver for his exclusive use and took no precautions to safeguard any privacy interest, she could not challenge the seizure of cocaine in plain view on the front seat).

The question remains as to whether Ross retained an objective expectation of privacy in the trunk—a part of the vehicle inaccessible to Palmeri and Nelson because Ross disabled the trunk release—and in the contents of the trunk—locked suitcases for which neither Palmeri nor Nelson carried keys. As Ross contends in his brief, these circumstances distinguish the present case from the facts of *United States v. Dall*, 608 F.2d 910 (1st Cir. 1979), and *State v. Abramoff*, 114 Wis. 2d 206, 338 N.W.2d 502 (1983), cases upon which the State heavily relies.

At first glance, the facts of *Abramoff* appear very similar to the facts of the present case. The owner of a vehicle, Abramoff, permitted his roommate, Mike Hagen, to drive his vehicle to Florida. Abramoff met Hagen and Sonny Grauer in Florida, deposited a substantial amount of marijuana in the trunk, and then returned to Wisconsin by plane. Hagen and Grauer drove the car back to Wisconsin. They were stopped in Kentucky, but law enforcement permitted them to return to Wisconsin as part of a sting operation. When Abramoff challenged the seizure of the marijuana in Kentucky, the district court concluded that Abramoff had no reasonable expectation of privacy in the vehicle. The Wisconsin Court of Appeals agreed.

> "In this case, Abramoff gave complete control of his car and its contents to third
> parties for a substantial time and distance. The possibility that the drugs might be
> exposed because of an accident or as a result of the third parties' conduct is a risk that
> Abramoff must have or should have considered when deciding to use the third parties'

16

services. The marijuana was placed in his car's trunk *without any special precautions*. His decision to surrender control over his automobile and the marijuana could only serve to reduce his expectation of privacy. We therefore agree with the trial court's conclusion that under these circumstances, Abramoff had no reasonable or legitimate expectation of privacy in the car at the time of the search in Kentucky." (Emphasis added.) *Abramoff*, 114 Wis. 2d at 211.

Although Ross similarly surrendered control over his car to Palmeri and Nelson to drive across eastern Colorado and Kansas, he did take precaution to exclude Palmeri and Nelson from the marijuana he placed in the trunk by disabling the trunk release, locking the suitcases, and withholding the keys. These facts are critical in determining whether Ross' expectation of privacy was reasonable.

*Dall* may have been helpful to the State's case but subsequent rulings by the court make it less so. In that case, Dall owned a truck with a camper top. He loaned the truck to Richard B. Hudson, Gary King, and Michael Holmes, who were later stopped in Rhode Island for speeding. Eventually, the Rhode Island State Police tracked down Dall and spoke with him on the phone. Dall claimed that the camper top had been empty when he loaned the vehicle to the other three men. When charged with interstate transportation of stolen goods, Dall attempted to challenge the search of the camper top by Rhode Island law enforcement. The district court and the First Circuit Court of Appeals rejected Dall's argument that his status as owner of the vehicle and the locked camper top established a reasonable expectation of privacy, essentially ruling that Dall had relinquished any expectation of privacy in the vehicle by loaning it to the three other men. 608 F.2d at 915.

The value of *Dall* to the State's case is questionable. Part of its reasoning relied on a distinction between searches of vehicles and searches of containers within those vehicles drawn in *Arkansas v. Sanders*, 442 U.S. 753, 763, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), and in *United States v. Chadwick*, 433 U.S. 1, 13, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977). See *Dall*, 608 F.2d at 915. This distinction was abrogated by the United

17

States Supreme Court in *California v. Acevedo*, 500 U.S. 565, 578-79, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991). To the extent that its reasoning is still valid, it may be distinguished in that the court recognized that Dall disclaimed any expectation of privacy in the camper top when he claimed that the camper top was empty when he loaned it. *Dall*, 608 F.2d at 915.

Ross cites *United States v. Powell*, 929 F.2d 1190, 1196 (7th Cir. 1991), for the proposition that his ownership in the vehicle provides him with a reasonable expectation of privacy. *Powell* does not provide persuasive authority in support of Ross' position because the court distinctly declined to decide the Fourth Amendment standing issue. The court found that if Powell possessed standing as owner of the vehicle, the officer possessed probable cause to conduct the search at the time the search was conducted. 929 F.2d at 1196.

Ross also relies on *United States v. Kye Soo Lee*, 898 F.2d 1034, 1038 (5th Cir. 1990). In *Kye Soo Lee*, Min Sik Lee rented a Ryder truck and padlocked the cargo hold. He then relinquished control of the vehicle to Kye Soo Lee and Min Ho Chay to drive. The truck was stopped by law enforcement and the truck was searched. The United States contended that none of the three individuals involved possessed a legitimate expectation of privacy in the truck. The Fifth Circuit Court of Appeals disagreed.

> "We [previously] held that while property rights are clearly a factor to be considered, they are neither the beginning nor the end of the inquiry. Other factors to be considered in making a determination of whether a defendant has an expectation of privacy 'whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premsises.' [Citation omitted.] With the exception of the last factor, all of the [*United States v.*] *Haydel*[, 649 F.2d 1152 (5th Cir. 1981)] factors militate in favor of a finding

18

that Min Sik Lee had standing to contest the search of the truck's cargo hold. Min Sik Lee rented the truck. It was up to him what he would do with the truck. Moreover, Min Sik Lee placed a padlock on the truck's cargo hold door and gave the keys only to Chay and Kye Soo Lee. In short, Min Sik Lee had, in the truck's cargo hold, a right to exclude others and an expectation of privacy from governmental intrusion that he took normal precautions to maintain. Thus, on these facts, we conclude that Min Sik Lee, like Chay and Kye Soo Lee, had standing to contest the search of the truck's cargo hold." *Kye Soo Lee*, 898 F.2d at 1038.

While this case supports Ross' position, the decision is not dispositive. As previously discussed, the weight of authority suggests that an owner (or a lawful possessor) of a vehicle relinquishes any reasonable expectation of privacy in the vehicle when he or she loans the vehicle to another person unless the borrower's access to the vehicle is restricted or limited in some manner. The reason for this rule is that the owner essentially relinquishes control to the borrower, who can use the vehicle as he or she wishes and invite whom he or she wishes to enter the vehicle, including law enforcement. By giving Kye Soo Lee and Min Ho Chay the keys to the padlocked cargo area as well as the vehicle keys, Min Sik Lee essentially forfeited control of the truck to Kye Soo Lee and Min Ho Chay.

Nevertheless, even if the reasoning of *Kye Soo Lee* is not determinative of the present case, the facts of this case take a step further than the facts in the *Kye Soo Lee* case to establish Ross' reasonable expectation of privacy in the contents of the trunk. Ross did not give Palmeri and Nelson access to the entire vehicle. By disabling the trunk and by retaining the keys to the padlocks on the suitcases, Ross retained virtually exclusive control over a portion of his vehicle.

The Tenth Circuit appears to have reached a different conclusion than *Kye Soo Lee* under similar facts. See *United States v. Blaze*, 143 F.3d 585, 591 (10th Cir. 1998). Even though the facts of the present case are not completely analogous to the facts of *Blaze*, the

19

case is instructive on the issue of control as a factor in determining a nonpresent owner's objective expectation of privacy in a loaned vehicle.

In *Blaze*, the defendant placed a briefcase containing marijuana and a handgun in the trunk of a rented vehicle before flying from Denver to California. Other men drove the car from Colorado to California. During the trip, one of the other men retrieved the gun from the briefcase and placed it in the glove compartment. The car was stopped for erratic driving in Utah. The officers discovered that neither occupant of the vehicle was authorized under the rental agreement and seized the vehicle. The vehicle was subsequently searched and the gun and the marijuana were seized. Blaze moved to suppress the evidence obtained in the search of the vehicle, and the State claimed a lack of standing. With regard to the search of the vehicle, the Tenth Circuit Court of Appeals reasoned, "It is undisputed he surrendered the car to his friends to drive to California. It is reasonable, therefore, to conclude he abandoned his privacy interest in the car as a whole. Thus, we hold he has no standing to challenge the search of the car." 143 F.3d at 591. The court, however, examined the briefcase differently. Because Blaze entrusted his briefcase to his associates for transportation but locked the briefcase, he retained a reasonable expectation of privacy in the contents of the briefcase. Blaze was able challenge the search of the briefcase. See 143 F.3d at 591.

The suitcases in the inaccessible trunk are legally indistinguishable from the briefcase at issue in *Blaze*. Neither Palmeri nor Nelson could access the contents of the trunk because the release had been disabled by Ross. Furthermore, the suitcases within the trunk were locked and neither Palmeri nor Nelson possessed a key to unlock them. As in *Blaze*, Ross retained a reasonable expectation of privacy in the contents of the trunk to which he retained a measure of control. Ross did not retain a reasonable expectation of privacy in the interior of the vehicle that was accessible to Palmeri and Nelson. Accordingly, Ross possessed standing to challenge the search of the trunk and the contents of the suitcases in the trunk but not the search of the vehicle generally.

20

To the extent that the district court's ruling on Fourth Amendment standing is properly interpreted to permit Ross to challenge all aspects of the seizure of Palmeri and Nelson and to challenge the search of all areas of the vehicle, the district court's decision must be reversed in part. Ross retained only the ability to challenge the search of the trunk and the suitcases contained therein.

It should be emphasized that the scope of Ross' retained expectation of privacy is not determinative of the remainder of Deputy Rhodd's search. See *Acevedo*, 500 U.S. at 579-80 (authorizing a search of an automobile and the containers within the automobile if the search is supported by probable cause). The limited scope of Ross' reasonable expectation of privacy limits his ability to challenge any other allegedly unlawful searches and seizures. Specifically, the determination as to the parameters of Ross' expectation of privacy does not determine the appropriateness of Deputy Rhodd's seizure and search of Palmeri and Nelson or his search of the interior of the vehicle.

Nevertheless, the State has not challenged the propriety of the district court's suppression ruling, except as to Ross' reasonable expectation of privacy in the vehicle. Any claim that the evidence would have inevitably been discovered has therefore been waived and abandoned. See *State v. Harris*, 293 Kan. 798, 808, 269 P.3d 820 (2012) (examining which suppression issues were presented to the district court and noting that an issue raised to the district court had not been pursued on appeal and had been abandoned).

Affirmed in part and reversed in part.